2014-1327

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

---

**BEST KEY TEXTILES CO., LTD.,**

Plaintiff-Appellant,

*v.*

**UNITED STATES OF AMERICA,**

Defendant-Appellee.

---

Appeal from the U.S. Court of International Trade, No. 13-cv-367,
Senior Judge R. Kenton Musgrave

---

**PRINCIPAL BRIEF FOR APPELLANT,
BEST KEY TEXTILES CO., LTD.**

---

John M. Peterson
 *Counsel of Record*
Maria E. Celis
Richard F. O'Neill
Russell A. Semmel
NEVILLE PETERSON LLP
17 State Street, 19th Floor
New York, NY 10004
(212) 635-2730
jpeterson@npwny.com

May 5, 2014

FORM 9. Certificate of Interest

---

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

BEST KEY TEXTILES CO., LTD.     v. UNITED STATES

No. 2014-1327

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party) appellant certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Best Key Textiles Co., Ltd.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Same

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

NEVILLE PETERSON LLP (John M. Peterson, George W. Thompson, Maria E. Celis, Russell A. Semmel, Richard F. O'Neill, Elyssa R. Emsellem)

March 12, 2014
Date

/s/ John M. Peterson
Signature of counsel

John M. Peterson
Printed name of counsel

Please Note: All questions must be answered
cc: _____

(i)

FORM 19.   Certificate of Compliance With Rule 32(a)

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑   The brief contains [        14,000        ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐   The brief uses a monospaced typeface and contains [                    ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☑   The brief has been prepared in a proportionally spaced typeface using [        Microsoft Office Word 2007        ] in [        Times New Roman (size 14)        ], or

☐   The brief has been prepared in a monospaced typeface using [                    ] with [                    ].

/s/ Russell A. Semmel
_____
(Signature of Attorney)

Russell A. Semmel
_____
(Name of Attorney)

Counsel for appellant Best Key Textiles Co., Ltd.
_____
(State whether representing appellant, appellee, etc.)

May 5, 2014
_____
(Date)

# TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTEREST ............................................................i

CERTIFICATE OF COMPLIANCE.................................................. ii

TABLE OF AUTHORITIES ...............................................................iv

STATEMENT OF RELATED CASES .................................................ix

STATEMENT OF JURISDICTION.....................................................1

STATEMENT OF THE ISSUE.............................................................2

STATEMENT OF THE CASE...............................................................2

STATEMENT OF FACTS ....................................................................4

STANDARD OF REVIEW .................................................................14

ARGUMENT ......................................................................................17

I.      The Lower Court Applied an Incorrect Standard of Review to Questions of Law. ......................................................................................17

II.     The CIT Erred in Ruling that the Subject Yarn Was Not "Metalized Yarn" of Heading 5605.................................................................24

        A.      Requirements for Classification as "Metalized Yarn" of Heading 5605 Are Clearly Spelled Out in the Statute. ......................................25

        B.      The CIT Erred in Holding that the *Eo Nomine* Provision for "Metalized Yarn" in Heading 5605 Did Not Cover All Forms of Metalized Yarns Within the Statute's Requirements. ..........................27

        C.      The CIT Erred in Finding that Heading 5605 Requires Metal Content to Impart Visual Effects or to Serve Specific Functions, Decorative or Otherwise, in the Yarn. ................................................37

        D.      CBP and the CIT Erred in Implying the Existence of a Minimum Metal Content Requirement for Yarns of Heading 5605....................40

III.    Procedural Irregularities and Substantive Inconsistencies Deprive the Revocation Ruling of Any Claim to *Skidmore* Deference. ...........................44

IV.     The Lower Court Erred as a Matter of Law in Denying Appellant's Motion for Unredacted Versions of the Administrative Record. ..................50

CONCLUSION ..................................................................................56

PAGE

*Best Key Textiles Co. v. United States*, Slip Op. 14-22 (Ct. Int'l Trade Feb. 25, 2014) .................................................................................................... 1a

# TABLE OF AUTHORITIES

PAGE(S)

**Cases**

*Alcan Aluminum Corp. v. United States*, 165 F.3d 898 (Fed. Cir. 1999) ............... 43

*Arbor Foods Inc. v. United States*, 30 C.I.T. 670 (2006) ......................................... 44

*Balt. Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87 (1983)...................... 18

*Bauer Nike Hockey USA, Inc. v. United States*, 393 F.3d 1246 (Fed. Cir. 2004) .......................................................................................................................... 22

*Baxter Healthcare Corp. of P.R. v. United States*, 182 F.3d 1333 (Fed. Cir. 1999) .............................................................................................................. 38, 39

*Best Key Textiles Co. v. United States*, 942 F. Supp. 2d 1367 (Ct. Int'l Trade 2013) .......................................................................................................................... 10

*Best Key Textiles Co. v. United States*, Slip Op. 13-145 (Ct. Int'l Trade Dec. 4, 2013) .................................................................................................................... 52

*Best Key Textiles Co. v. United States*, Slip Op. 13-148 (Ct. Int'l Trade Dec. 13, 2013) ............................................................................................................ 3, 11

*Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. DOJ*, 697 F.3d 184 (2d Cir. 2012) ................................................................................................................. 53

*Brookside Veneers, Ltd. v. United States* 847 F.2d 786 (Fed. Cir. 1988) ............... 35

*Carl Zeiss, Inc. v. United States*, 195 F.3d 1375 (Fed. Cir. 1999) .................. 31, 37

*Chevron Chem. Co. v. United States*, 23 C.I.T. 500 (1999) .................................... 35

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).............. 11

*City of Cleveland v. Ohio*, 508 F.3d 827 (6th Cir. 2007) ......................................... 20

*Clarendon Mktg., Inc. v. United States*, 21 C.I.T. 59 (1997)............................ 18, 24

*Coastal States Gas Corp. v. DOE*, 617 F.2d 854 (D.C. Cir. 1980) ......................... 53

*Crystal Clear Indus. v. United States*, 44 F.3d 1001 (Fed. Cir. 1995) ................... 18

*Cummins Inc. v. United States*, 454 F.3d 1361 (Fed. Cir. 2006)............................. 14

PAGE(S)

*Deribeaux v. Sec'y of HHS*, 717 F.3d 1363 (Fed. Cir. 2013) .......................... 16, 20

*EMR Network v. FCC*, 391 F.3d 269 (D.C. Cir. 2004) ...........................................21

*Grider v. Keystone Health Plan Cent., Inc*., 580 F.3d 119 (3d Cir. 2009).............54

*Heartland By-Prods., Inc. v. United States*, 264 F.3d 1126 (Fed. Cir. 2001) .. 11, 19

*Heartland By-Prods., Inc. v. United States*, 568 F.3d 1360 (Fed. Cir. 2009) ..........6

*Home Box Office, Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977)........................... 49, 54

*Hoyt, Shepston & Sciaroni v. United States*, 52 C.C.P.A. 101 (1965) ...................35

*In re Sealed Case*, 121 F.3d 729 (D.C. Cir. 1997) ...............................................55

*Int'l Cust. Prods., Inc. v. United States*, 32 C.I.T. 302 (2008) ........................ 49, 54

*Int'l Cust. Prods., Inc. v. United States*, No. 13-1176 (Fed. Cir. April 14, 2014)................................................................................................................6

*Jarvis Clark Co. v. United States*, 733 F.2d 873 (1984)............................. 19, 20, 34

*JVC Co. of Am. v. United States*, 234 F.3d 1348 (Fed. Cir. 2000) .........................15

*Kent v. Principi*, 389 F.3d 1380 (Fed. Cir. 2004) ..................................................21

*Life Extension Found., Inc. v. IRS*, 915 F. Supp. 2d 174 (D.D.C. 2013)................53

*Little Co. of Mary Hosp. v. Sebelius*, 587 F.3d 849 (7th Cir. 2009)......................16

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ...............................................13

*Mead Corp. v. United States,* 185 F.3d 1304 (Fed. Cir. 1999)...............................17

*Mead Corp. v. United States*, 283 F.3d 1342 (Fed. Cir. 2002)...............................16

*Medline Indus., Inc., v. United States*, 62 F.3d 1407 (Fed. Cir. 1995)...................15

*Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007 (9th Cir. 2007) ...................54

*Metal Film Co. v. Metlon Corp.*, 316 F. Supp 96 (S.D.N.Y. 1970) .......................29

*Michaels Stores, Inc. v. United States*, 931 F. Supp. 2d 1308 (Ct. Int'l Trade 2013)...............................................................................................................21

*Midwest of Cannon Falls v. United States*, 122 F.3d 1423 (Fed. Cir. 1997) .........34

*Mil. Audit Project v. Casey*, 656 F.2d 724 (D.C. Cir. 1981) .................................53

*Nat'l Council of La Raza v. DOJ*, 411 F.3d 350 (2d. Cir. 2005)............................52

*NEC Am., Inc. v. United States*, 8 C.I.T. 184 (1984)..............................................27

*New York v. NRC*, 589 F.3d 551 (2d Cir. 2009) ....................................................21

PAGE(S)

*Nidec Corp. v. United States*, 68 F.3d 1333 (Fed. Cir. 1995) ................................27

*Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136 (9th Cir. 2007) ...................................................................................18

*Pillowtex Corp. v. United States*, 171 F.3d 1370 (Fed. Cir. 1999).........................14

*Rifkin Textiles Corp. v. United States*, 297 F. Supp. 1127 (Cust. Ct. 1969) ..........33

*Rubie's Costume Co. v. United States*, 337 F.3d 1350 (Fed. Cir. 2003) .................15

*Russell Stadelman & Co. v. United States*, 242 F.3d 1044 (Fed. Cir. 2001)..........15

*Schreiber v. Soc'y for Sav. Bancorp, Inc.*, 11 F.3d 217 (D.C. Cir. 1993) ..............53

*Sears, Roebuck & Co. v. United States*, 46 C.C.P.A. 79 (1959) ............................35

*Skidmore & Swift v. United States*, 323 U.S. 134 (1944) ................................. 11, 44

*Tuscany Fabrics Inc. v. United States*, 65 Cust. Ct. 182 (1970) ...........................43

*United States v. Citroen*, 223 U.S. 407 (1912) ................................................ 25, 44

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .................................................15

*United States v. Nixon*, 418 U.S. 683 (1974) .........................................................53

*United States v. Standard Surplus Sales Inc.*, 69 C.C.P.A. 34 (1981) ...................36

*United States v. Tex. Instrums., Inc.*, 67 C.C.P.A. 59 (1981) .................................36

*Universal Elecs. v. United States*, 112 F.3d 488 (Fed. Cir. 1997).........................15

*Warner Lambert Co. v. United States*, 407 F.3d 1207 (Fed. Cir. 2005).................15

*Wis. Dept. of Revenue v. Wm. Wrigley, Jr., Co.*, 505 U.S. 214 (1999) ..................42

**Statutes**

5 U.S.C. § 552 (2009) .............................................................................................52

5 U.S.C. § 553 (1966) .............................................................................................18

5 U.S.C. § 556 (1990) .............................................................................................18

5 U.S.C. § 557 (1976) .............................................................................................18

5 U.S.C. § 706 (1966) ................................................................................ 11, 16, 17

19 U.S.C. § 1202 (Harmonized Tariff Sched. of the United States) (2007) ............2

—Chapter 56 Notes..............................................................................................27

—Gen. R. Interp. 3 ..............................................................................................22

—Heading 3101 ...................................................................................................31

PAGE(S)

—Heading 3805 ..................................................................31

—Heading 3920 ..................................................................31

—Heading 4807 ..................................................................31

—Heading 5404 ..................................................................25

—Heading 5405 ..................................................................25

—Heading 5605 .................................................. 2, 25, 26, 31

19 U.S.C. § 1625 (1996) .....................................................3

28 U.S.C. § 1295 (2011) .....................................................1

28 U.S.C. § 1581 (2009) .....................................................3

28 U.S.C. § 1927 (1980) ...................................................54

28 U.S.C. § 2639 (1980) ...................................................15

28 U.S.C. § 2640 (1993) ...................................................11

28 U.S.C. § 2643 (1993) ...................................................19

**Regulations**

19 C.F.R. § 177.2 ................................................................6

19 C.F.R. § 177.9 ......................................................... 7, 45

19 C.F.R. § 177.12 ..............................................................8

**Court Rules**

U.S. Ct. Int'l Trade R. 26..................................................53

**Legislative Materials**

*Customs Modernization and Informed Compliance Act: Hearing on H.R. 3935 Before the Subcomm. on Trade of the H. Comm. on Ways & Means,* 102d Cong. (1992)...........................................................49

**Administrative Rulings & Materials**

47 Cust. B. & Dec., no. 18 (Apr. 24, 2013) .....................8, 9

47 Cust. B. & Dec., no. 41 (Oct. 2, 2013) .........................10

*HQ 952934* (July 19, 1993) .............................................26

*HQ 964997* (May 20, 2002)..............................................39

*HQ H202560* (Sept. 17, 2013) ...........................................3

*HQ H226262* (Sept. 17, 2013) .........................................10

PAGE(S)

*NY A88665* (Oct. 25, 1996) ................................................................39

*NY F83891* (Mar. 7, 2000) ...............................................................41

*NY J82790* (Apr. 3, 2003) ................................................................41

*NY L86561* (Aug. 8, 2005) ...............................................................41

*NY N034758* (Aug. 15, 2008) ...........................................................41

*NY N187601* (Oct. 25, 2011) ..............................................................3

*NY N196161* (Apr. 13, 2012) ..............................................................7

*NY N246822* (Nov. 13, 2013) ...........................................................29

**Miscellaneous**

*Cambridge Dictionary Online*, http://dictionary.cambridge.org/us/ ......32

Claire R. Kelly, *Remnants of Customs Litigation: Jurisdiction and Statutory Interpretation*, 26 Brook. J. Int'l L. 861 (2001) .....................................23

David Braunde, *Georgia in Antiquity: A History of Colchis and Transcaucasian Iberia, 550 BC–AD 562* (1994) ...................................28

*Exodus* .............................................................................................28

Katherine Bourzac, *Spinning Nano Yarns: A Method for Turning Powders into Fibers Has Many Potential Applications*, M.I.T. Tech. Rev., Jan. 7, 2011 ...............................................................................................30

Kax Wilson, *A History of Textiles* (Westview Press 1979) ...................28

M. Joshi et al., *Characterization for Nanotechnology Applications in Textiles*, 33 Indian J. Fibre & Textile Res. 304 (2008) .........................30

Maria Hayward: *Rich Apparel: Clothing and the Law in Henry VIII's England* (2009) .................................................................................28

Martin Grayson, *Encyclopedia of Textiles, Fibers, and Nonwoven Fabrics* (1st ed. 1984) ........................................................................... 4, 30

*Merriam-Webster Online Dictionary*, http://www.merriam-webster.com/ ........................................... 32, 39, 43

*Psalms* ..............................................................................................28

S.S. Chinchwade et al., *Application of Nanometals in Textiles—Part 1*, Textile Review, Apr. 2012 .................................................................30

PAGE(S)

U.S. Cust. & Border Prot., *What Every Member of the Trade Community Should Know About: Classification of Fibers and Yarns under the HTSUS* (Sept. 2011) ........................................................................... 41

U.S. Cust. & Border Prot., *What Every Member of the Trade Community Should Know About: Classification: Apparel Terminology under the HTSUS* (June 2008) .................................................................. 40

Will Soutter, *Nanotechnology in Textiles* (2012) .................................................. 30

World Cust. Org., *Harmonized Commodity Description and Coding System Explanatory Notes* (3d ed. 2002) ................................................................ passim

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the U.S. Court of Appeals for the Federal Circuit, counsel for appellant Best Key Textiles Co., Ltd., hereby states that no other appeal in or from this civil action in the lower court was previously before this or any other appellate court, nor is any case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

2012-1402, -1403

# United States Court of Appeals
# for the Federal Circuit

---

## BEST KEY TEXTILES CO., LTD.,

Plaintiff-Appellant,

***v.***

## UNITED STATES OF AMERICA,

Defendant-Appellee.

---

Appeal from the U.S. Court of International Trade, No. 13-cv-367,
Senior Judge R. Kenton Musgrave

---

## PRINCIPAL BRIEF FOR APPELLANT,
## BEST KEY TEXTILES CO., LTD.

---

## <u>STATEMENT OF JURISDICTION</u>

Appellant Best Key Textiles Co., Ltd. ("Best Key") appeals from *Best Key Textiles Co. v. United States*, Slip Op. 14-22 (App. 1a–27a) (the "Opinion"), a final decision of the U.S. Court of International Trade (CIT) dated February 25, 2014. Appellant timely filed a notice of appeal on February 27, 2013. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(5) (2011).

## STATEMENT OF THE ISSUE

The issue presented is whether the CIT erred, as a matter of law, in upholding the ruling of U.S. Customs and Border Protection (CBP or "Customs") that Appellant's Best Key Metalized Yarn (BKMY) product is not classifiable as a metalized yarn under heading 5605 of the Harmonized Tariff Schedule of the United States (HTSUS), 19 U.S.C. § 1202 (2007). In the alternative, Appellant asks this Court to rule that certain procedural and substantive errors performed by CBP during the course of its ruling revocation review proceeding renders the revocation arbitrary, capricious, and otherwise not in accordance with law.

## STATEMENT OF THE CASE

This appeal presents a straightforward issue of tariff classification—whether Appellant's "Best Key Metalized Yarn" (BKMY), a product produced by injecting nanometal powders through a spinneret during yarn formation, is properly classified under HTSUS heading 5605 as "Metalized yarn, whether or not gimped, being textile yarn, or strip or the like of heading 5404 or 5405, combined with metal in the form of thread, strip or powder or covered with metal". Although the issue arises in the context of judicial review of a CBP ruling on the product rather than following a protest denial, Appellant submits that the standard of review—whether

CBP's classification is "in accordance with law"—is the same as in any other classification appeal.

In *CBP New York Ruling (NY) N187601* (Oct. 25, 2011) (the "Yarn Ruling") (App. 41a–42a), the agency correctly ruled that BKMY is properly classified as metalized yarn of heading 5605. CBP erred when, pursuant to 19 U.S.C. § 1625(c) (1996), it revoked that ruling, replacing it with *CBP Headquarters Ruling (HQ) H202560* (Sept. 17, 2013) (the "Revocation Ruling") (App. 48a–59a), which held that BKMY is *not* a metalized yarn.

Its business devastated, Appellant brought this action to seek judicial review of the Revocation Ruling. After initially dismissing the action on jurisdictional grounds, *Best Key Textiles Co. v. United States* ("*Best Key I*"), Slip Op. 13-148 (Ct. Int'l Trade Dec. 13, 2013), the CIT granted Appellant's motion for reconsideration, assumed jurisdiction of this action under 28 U.S.C. § 1581(i)(4) (2009), and—without hearing argument on the merits—denied Appellant's motion for judgment on the agency record, upholding the Revocation Ruling. Appellant submits that the Revocation Ruling is arbitrary, capricious, and otherwise not in accordance with law, and that the CIT erred in upholding it.

## <u>STATEMENT OF FACTS</u>

The facts concerning the nature of BKMY are uncontested, and appear in the administrative record on which the CIT's review was based.

Three decades ago, industry experts predicted that metalized yarns produced "directly from the liquid phase" would be developed and would revolutionize the yarn industry—

> The most significant reason for the slow development of economical [metalized yarn] processes is the difficulty of forming metal filament directly from the liquid phase. This arises from the unusually high ratio of surface tension to viscosity, which results in liquid-jet instability, and from the inability to attenuate significantly the stream outside the spinneret as is the usual practice in the synthetic-fiber industry.

Martin Grayson, *Encyclopedia of Textiles, Fibers, and Nonwoven Fabrics* 231 (1st ed. 1984) (App. 61a). That day has come. Best Key, a Hong Kong-based textile manufacturer, solved this longstanding problem in developing BKMY, a metalized yarn made by a new, innovative and long-anticipated process. In the BKMY process, a combination of metal nanopowders and liquid polyester is ejected (extruded) through the small holes of a spinneret, forming monofilament yarns. The metal powders are permanently and inseparably combined with the polyester or rayon at the moment of yarn formation. App. 62a–64a, 78a–81a.

BKMY indisputably contains deliberately-added metal nanopowders, which are usually zinc or aluminum, as detected and measured through analysis by private and CBP laboratories of garments made of the yarn. *Id.* at 71a–76a, 106a–

08a. The administrative record reflects that the metal powders in BKMY impart antimicrobial and ultraviolet protection properties, *id.* at 64a, 78a–79a, although such properties are not conditions for classification under heading 5605.

Professor Ingrid Johnson, Assistant Chairperson in the Textile Development & Marketing Department and Acting Associate Chairperson in the Home Products Department at the Fashion Institute of Technology (FIT) and editor of the authoritative *Fairchild's Dictionary of Fashion*, testified—

> To my knowledge metallic yarn or metallic fiber is not limited by the amount of metal present in the yarn or fiber, and metal—such as aluminum, zinc, or titanium, may be added at various times during the yarn manufacturing process. While in some applications, metal is added to provide a shiny appearance, this is not a requirement for metalized yarn. Metal may be added in powder form, for purposes such as providing antimicrobial properties, or increased resistance to ultraviolet (UV) radiation. Finally, the metal does not have to be seen by the naked eye and the textile made from the yarn or fiber may have a soft feel and look, rather than only a harsh metallic appearance like Lurex®. This is increasingly the case as nanometals are added to fibers to impart a variety of practical, non-visual properties.

*Id.* at 91a. Professor Johnson further testified, having examined samples of BKMY and the process used to make it, that—

> 8. Best Key Textiles Inc.'s metallic yarn (BKMY), which has a presence of .7%−.8% of metal: (zinc, titanium, or aluminum) and does not have a metallic look or feel, either in yarn or fabric form, the feel or look of metal in the fabric, is in my judgment a metallic yarn as that term is commercially known.

\* \* \*

10. Science and industry are continually experimenting to find new ways of making fibers with desirable characteristics. Years ago, the ability to produce microdenier yarns and fabrics changed the industry. At present, the use of nanometals in fibers, which is what the Best Key process entails, is one of the key developments in textile science.

*Id.* at 92a.

Seeking to commercialize its invention, Appellant on October 3, 2011 sought from CBP, pursuant to 19 C.F.R. § 177.2, a ruling concerning the tariff classification of polyester monofilament yarns made using the BKMY process. On October 25, CBP issued the Yarn Ruling, *NY N187601*, which confirmed that BKMY was properly classified as "metalized yarn" of HTSUS 5605.00.90. The Yarn Ruling stated, "For tariff purposes, a yarn combined with metal in the form of powder is considered a metalized yarn," App. 41. In reliance on this ruling, Appellant commercialized its product, successfully selling BKMY to fabric and apparel makers.

CBP has never suggested that the description of BKMY on which the Yarn Ruling was based was inaccurate or incomplete.[1] The agency simply changed its view regarding legal requirements for classification as "metalized yarn" under heading 5605. CBP's change of mind appears to stem from its subsequent realiza-

---

[1] In that respect, this case is distinguishable from *Heartland By-Products, Inc. v. United States*, 568 F.3d 1360, 1363 n.3 (Fed. Cir. 2009), or *International Custom Products Inc. v. United States*, No. 13-1176, slip op. at 4 (Fed. Cir. April 14, 2014), where it was contended that the product description in ruling requests was inaccurate.

tion that, while metalized yarns of heading 5605 attract a higher rate of duty than non-metalized yarns, they can be used to make imported apparel products that, if in chief weight of metalized yarns, are subject to much lower rates of duty than garments made from non-metalized yarns.[2]

Appellant thus, on December 5, 2011, requested a ruling on the tariff classification of a sample "Johnny collar" men's knit pullover garment composed entirely of BKMY. Appellant contended that the garment is classified under HTSUS 6105.90.8030 as men's or boys' knit shirts of "other" fabrics. Documents (App. 96a–110a) obtained under the Freedom of Information Act (FOIA) reveal that during CBP's consideration of the request, Laboratory and National Import Specialist (NIS) personnel detected the added metal in the yarn comprising the garment, *id.* at 106a–08a, but conspired to disregard both the presence of the metal and the Yarn Ruling in classifying the shirt, *id.* at 109a—a deliberate violation of section 177.9(a) of the CBP Regulations, 19 C.F.R. § 177.9(a).[3] Thus, in *NY N196161* (Apr. 13, 2012) (the "Johnny Collar Ruling") (App. 94a–95a), CBP, making no

---

[2] That these considerations motivated CBP's revocation, at least in part, is suggested by a memorandum of record prepared by the agency's National Import Specialist staff detailing potential declines in duty collection if apparel were made with BKMY. App. 153a–54a.

[3] 19 C.F.R. § 177.9(a) states, "A ruling letter issued by the Customs Service under the provisions of this part represents the official position of the Customs Service with respect to the particular transaction or issue described therein and is binding on all Customs Service personnel in accordance with the provisions of this section until modified or revoked."

mention that the garment was constructed of BKMY or any metalized yarn, classi-fied the garment as a pullover of man-made non-metalized fibers under HTSUS 6110.30.30.  The ruling reflected the forgery in the laboratory report, stating that "[CBP] laboratory analysis has determined that the fabric of [the garment] is com-posed wholly of polyester yarns."  Appellant objected, and on June 27, 2012 re-quested (App. 111a–25a), pursuant to 19 C.F.R. § 177.12, that CBP reconsider and revoke the Johnny Collar Ruling, and acknowledge the presence of the metal in the yarn comprising the shirt as directed by the Yarn Ruling.

In response, on April 24, 2013, CBP, acting in accordance with 19 U.S.C. § 1625(c), published in the *Customs Bulletin* a notice of proposed revocation of the Johnny Collar Ruling, 47 Cust. B. & Dec., no. 18, at 26 (App. 126a–28a), which explained that "the holding in NY N196161 is contrary to a prior ruling, NY N187601, dated October 25, 2011, which classified the yarn from which the sub-ject pullover is made in heading 5605, HTSUS, as a metalized yarn.  A knitted or crocheted pullover made wholly of metalized yarn would be classified in subhead-ing 6110.90.90.  Hence, the classification of the 'Johnny Collar' pullover in sub-heading 6110.30.30, HTSUS, contrary to NY N187601, was not in compliance with 19 U.S.C. § 1625(c)(1)," App. 127a–28a.  CBP thus acknowledged that the garment was made from metalized yarn.

In the *Customs Bulletin* notice immediately following, 47 Cust. B. & Dec., no. 18, at 33 (App. 129a–36a), however, CBP announced its intention to revoke the Yarn Ruling, adopting a new agency interpretation of "metalized yarn," and proposing to reclassify BKMY under HTSUS 5402.47.90 as non-metalized synthetic filament yarn. CBP admitted the presence of metal in BKMY, yet found the level of metal insufficient for classification purposes because (i) the metal was not discernible to the "naked eye," App. 135a; (ii) BKMY's manufacturing process differed from traditional methods for producing metalized yarns, *id.* at 134a; (iii) the "look and feel" of BKMY differs from the "look and feel" of other metalized yarns, *id.* at 134a–35a; and (iv) BKMY does not share an "essential resemblance" to metalized yarns, *id.* at 133a. CBP's proposal was remarkable, since nothing in heading 5605 or its Explanatory Notes (ENs)[4] requires metalized yarns to have a minimum metal content, visible characteristics, a given "look or feel," or specific uses. As CBP would reclassify BKMY as non-metalized yarn, the revocation of the Johnny Collar Ruling was short-lived.

As discussed *infra*, CBP's Yarn Ruling revocation proceeding was attended by numerous irregularities. CBP personnel and outside sources reported that there were several types of metalized yarns manufactured by "liquid state" processes

---

[4] World Cust. Org., *Harmonized Commodity Description and Coding System Explanatory Notes* (3d ed. 2002).

similar to Appellant's, but CBP disregarded this information. *Id.* at 142a, 149a. Extensive comments opposed CBP's proposal, *id.* at 77a, 138a–41a; none supported it. After agency attorneys indicated that the comments in opposition had "merit," *id.* at 144a, CBP conducted an off-the-record hearing with domestic interests, including domestic lobbying group the National Council of Textile Organizations (NCTO) and domestic yarn spinner Unifi, Inc. ("Unifi"), to solicit their "comments" on the proposal. *Id.* at 146a–48a. The domestic interests never told CBP that BKMY was not a metalized yarn—Mike Hubbard, NCTO's president, indicated his awareness of other yarn spinners using similar production technologies—but the domestic interests did express a concern that, if BKMY were classified as a metalized yarn, they might lose advantages under various U.S. free trade agreements. *Id.* at 148a.[5]

After Appellant sued to compel publication of a final determination, *Best Key Textiles Co. v. United States*, 942 F. Supp. 2d 1367 (Ct. Int'l Trade 2013) (No. 13–268), CBP issued the Revocation Ruling, *HQ H202560*.[6] 47 Cust. B. & Dec., no. 41, at 19 (Oct. 2, 2013) (App. 48a–59a).

---

[5] After placing memoranda memorializing these discussions on the record, CBP sought unsuccessfully to withdraw filing affirmations suggesting that the discussions were irrelevant to CBP's decision, or, incredibly, that they occurred after the final decision had been issued.

[6] CBP simultaneously issued the revocation of the Johnny Collar Ruling as *HQ H226262* (Sept. 17, 2013). 47 Cust. B. & Dec., no. 41, at 15 (App. 43a–48a).

Appellant then filed this action in the CIT under 28 U.S.C. § 1581(i)(4), seeking judicial review of the Revocation Ruling. Appellant's cause of action sounds in the Administrative Procedure Act (APA), as it is aggrieved, through massive financial losses, by final adverse agency action—*i.e.*, publication of the Revocation Ruling. Appellant asked the CIT, and asks this Court, to set aside the Revocation Ruling as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, as required by 5 U.S.C. § 706(2)(A) (1966) and 28 U.S.C. § 2640(e) (1993).

After reversing an initial dismissal for lack of subject-matter jurisdiction, *Best Key I*, *supra*, Slip Op. 13-148, the CIT reviewed the Revocation Ruling, applying what it termed the "most deferential" standard of review possible. Indeed, the CIT suggested that because ruling revocations "are conducted through formal notice and comment procedure," App. 5, the Revocation Ruling deserved binding deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984); but, citing *Heartland By-Products, Inc. v. United States*, 264 F.3d 1126 (Fed. Cir. 2001), stated that it would accord the ruling deference under *Skidmore & Swift v. United States*, 323 U.S. 134 (1944), App. 6.

Turning to the merits of the Revocation Ruling, the CIT held that heading 5605, while an *eo nomine* provision, was subject to a number of conditions and exceptions posited by CBP that are neither evident from the language of the heading

itself nor from its accompanying ENs—and which, for that matter, are inconsistent with CBP's own administration of the tariff. The CIT noted that "although the 'clarity' of heading 5605 literally covers all forms of yarn-and-metal combinations, CBP implicitly found that the language could not be interpreted literally because it was not, in fact, intended to cover all forms" of the metalized yarns described therein. *Id.* at 14. The CIT referred to four (4) exclusions contained in the ENs, none remotely relevant to this case. *Ibid.*[7]

The CIT found "persuasive" CBP's conclusions (1) that, due to its method of manufacture, BKMY does not constitute "textile yarn" "combined with metal," *id.* at 14–15; (2) that metalized yarns of heading 5605 must have visible metallic properties and be used for decorative purposes, *id.* at 21–22; and (3) that metalized yarn of heading 5605 must contain a minimum metal content, *id.* at 19–20, 25—an unstated content level, but one which, apparently, BKMY does not meet. Appel-

---

[7] The ENs to heading 5605 provide that "[t]he heading does not include":

(a) Yarn composed of a mixture of textile materials and metal fibres conferring on them an antistatic effect (Chapters 50 to 55, as the case may be);

(b) Yarn reinforced with metal thread;

(c) Cords, galloons or other articles having the character of ornamental trimmings (heading 58.08)

(d) Wire or strip of gold, silver, copper, aluminum or other metals (Section XIV and XV).

CBP has never suggested that BKMY falls within any of these exceptions. Indeed, the record indicates that BKMY has no antistatic properties. App. 63a.

lant submits that CBP's and the CIT's conclusions on each of these points are legally erroneous.

Confronted with a strictly legal question of tariff classification, the CIT refused to discharge its burden to "say what the law is," *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803), and to determine whether the Revocation Ruling was "in accordance with law," as the APA commands. Instead, the CIT found heading 5605 to be "ambiguous" regarding its coverage, declared that "*it is not the court's function in this proceeding to resolve that ambiguity*," but only to declare whether CBP's position has "power to persuade." App. 15 (emphasis added). It then deferred to CBP's newly adopted views, which imposed limitations and conditions on heading 5605 not found in the statute itself. The lower court completely shunned its obligation, when addressing a legal question of tariff classification, to determine whether CBP's interpretation was "in accordance with law."

The CIT thus failed to apply the correct standard of review to the legal question presented. There cannot be two bodies of tariff classification law—one where the courts reach the "single correct classification" using the rules of statutory and judicial construction developed for the HTSUS, and a second where classifications are upheld as merely "persuasive" in the face of competing classifications. The HTSUS has always been configured to determine a single correct classification for

any product; this rule is not abrogated based on the procedural mechanism by which the classification is raised.

Finally, the CIT held that the apparent procedural irregularities in the conduct of CBP's 19 U.S.C. § 1625(c) revocation review, including the agency's reliance on falsified CBP laboratory reports and its *ex parte* hearings with domestic interests—did not affect the Revocation Ruling's "power to persuade." Appellant contends that these serious procedural irregularities perverted the revocation review process established by Congress, and render not only the Revocation Ruling "not in accordance with law," but also the process used to create it "arbitrary and capricious."

## STANDARD OF REVIEW

Resolving the tariff classification of merchandise entails a two-step process: (1) ascertaining the proper meaning of specific terms in the relevant tariff provisions; and (2) determining whether the merchandise at issue comes within the description of such terms as properly construed. *Pillowtex Corp. v. United States*, 171 F.3d 1370, 1373 (Fed. Cir. 1999). Where, as here, "the nature of the merchandise is undisputed … the classification issue collapses entirely into a question of law." *Cummins Inc. v. United States*, 454 F.3d 1361, 1363 (Fed. Cir. 2006) (citations omitted). This Court reviews questions of law *de novo*, without deference to

the court below.  *Russell Stadelman & Co. v. United States*, 242 F.3d 1044, 1048 (Fed. Cir. 2001); *Medline Indus., Inc., v. United States*, 62 F.3d 1407, 1409 (Fed. Cir. 1995).  While CBP classifications are by law presumed to be correct, 28 U.S.C. § 2639(a)(1) (1980), this presumption has no effect where, as here, there are no disputed questions of fact.  *Universal Elecs. v. United States*, 112 F.3d 488, 492–93 (Fed. Cir. 1997).

This appeal involves judicial review of a CBP ruling.  While the court accords deference to CBP classification rulings relative to their  power to persuade, *United States v. Mead Corp*., 533 U.S. 218, 235 (2001) (citing *Skidmore*, 323 U.S. at 134), the court has an independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS terms.  *Warner Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing *Rocknel Fastener, Inc. v. United States,* 267 F.3d 1354, 1358 (Fed. Cir. 2001)).  As the master rule of tariff construction is to carry out the intent of the legislature, the starting point for interpreting a tariff term is the language of the statute itself.  *Rubie's Costume Co. v. United States*, 337 F.3d 1350, 1357 (Fed. Cir. 2003) (citations omitted). The Court may look to common and commercial meanings of terms, if such construction would not contravene legislative intent.  *JVC Co. of Am. v. United States*, 234 F.3d 1348, 1352 (Fed. Cir. 2000).  To ascertain the common meaning of a tariff term, the court

may refer to dictionaries, scientific authorities, and similarly reliable resources. *Mead Corp. v. United States*, 283 F.3d 1342, 1346 (Fed. Cir. 2002).

Finally, this case was brought under the CIT's 28 U.S.C. § 1581(i)(4) "residual" jurisdiction, and pursuant to § 2640(e), the agency's action is reviewed under the standard specified in the APA, 5 U.S.C. § 706(2)(A), which requires a reviewing court to set aside agency action which is "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." Findings of fact are reviewed under the "arbitrary [and] capricious" standard; matters within an agency's discretion are reviewed for "abuse of discretion"; and legal conclusions are reviewed under the "not in accordance with law" standard, whereby no deference is afforded to the lower court. *Deribeaux v. Sec'y of HHS*, 717 F.3d 1363, 1366 (Fed. Cir. 2013) (citing *Munn v. Sec'y of HHS*, 970 F.2d 863, 870–73 & n.10 (Fed. Cir. 1992)). As noted in *Little Co. of Mary Hospital v. Sebelius*, 587 F.3d 849, 853–54 (7th Cir. 2009), "As is true of deference to any decision by an administrative agency, this deference is limited by the clear meaning of the statute as revealed by its language, purpose and history."

## **ARGUMENT**

### I.  **The Lower Court Applied an Incorrect Standard of Review to Questions of Law.**

The CIT was required to review the Revocation Ruling under the APA to determine whether it was "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law."  There are no disputed questions of fact concerning BKMY, its process of manufacture, its properties, or its uses.  Appellant has never asserted that any fact findings by CBP regarding its product were "arbitrary," "capricious," or for that matter, incorrect.  The proceeding involved no discretionary decisions reviewable for "abuse of discretion."  The sole question was whether, in holding BKMY not to be a "metalized yarn" of heading 5605, the Revocation Ruling was "not in accordance with law."  The meaning of a tariff term is "a matter of statutory interpretation" and "is a question of law."  *Mead Corp. v. United States,* 185 F.3d 1304, 1306 (Fed. Cir. 1999).

The CIT, in an opinion by Senior Judge R. Kenton Musgrave, disregarded the "not in accordance with law" portion of the standard, concerning itself only with whether the Revocation Ruling was "arbitrary and capricious."  Asserting that the "arbitrary and capricious standard of review" is "the most deferential of the APA standards of review," App. 5, the CIT said that the only questions before it were whether there had been a "clear error of judgment" and "whether a rational connection existed between the agency's fact findings and its ultimate action,"

*ibid.*[8] The CIT abdicated its role of determining whether CBP's classification conclusion was legally correct, holding there to be "ambiguity" in the statutory language, but declining to resolve it using statutory or judicially-crafted tools of statutory interpretation. *Id.* at 15 (stating "it is not the court's function in this proceeding to resolve that ambiguity").

Saying "this is not an 'ordinary' classification case," *id.* at 4, the CIT suggested that the Revocation Ruling, having undergone "notice and comment" proceedings,[9] was an agency pronouncement of a type deserving binding *Chevron* deference, *id.* at 5–6, even though this Court long ago rejected the notion of *Chevron* deference for classification decisions.[10] "Mindful" of this Court's decision in

---

[8] The connection referred to by the CIT is the standard used to determine whether agency action is "arbitrary and capricious," *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1145 (9th Cir. 2007), rather than "not in accordance with law." It is used in cases where the agency is called upon to make a "policy judgment," *Balt. Gas & Elec. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983), not to resolve a question of law.

[9] While CBP publishes notices of proposed revocation under 19 U.S.C. § 1625(c), these are not subject to all of the formalities of notice and comment rulemaking under section 4 of the APA, 5 U.S.C. § 553 (1966). *See id.* §§ 556 (1990) (opportunity for hearings), 557 (1976) (preliminary determinations).

[10] *See Crystal Clear Indus. v. United States*, 44 F.3d 1001, 1003 n.* (Fed. Cir. 1995) ("Our agreement with the opinion of the CIT does not extend to the suggestion that a routine classification dispute is entitled to special deference under [*Chevron*]."). The CIT judge who decided this case acknowledged this doctrine in *Clarendon Marketing, Inc. v. United States*, 21 C.I.T. 59, 61 (1997) ("Nor does the Court extend to Customs routine classification decisions the ordinary measure of indulgence afforded to an agency's discretionary activities."). Instead, in rendering its decision the court "must consider whether the government's classification is

*Heartland By-Products*, *supra*, 264 F.3d 1126, the CIT indicated that the Revocation Ruling was, additionally or alternatively, entitled to *Skidmore* deference. App. 6. Judge Musgrave questioned (*id.* at 3–4 & nn. 2–3) whether this case was governed by the rule of *Jarvis Clark*, which requires a reviewing court in a tariff classification case to reach the single correct result—even though this Court has indicated that *Jarvis Clark* applies to *all* classification questions, regardless of how the classification dispute reaches it. *Jarvis Clark* discussed the legislative history of 28 U.S.C. § 2643(b) (1993),[11] noting that the obligation was not limited to cases arising from a denied protest—

> [I]t is clear that Congress intended to alter the existing procedure for classification and valuation protests. As initially drafted, § 2643(b) applied *only* to such protests. The Subcommittee on Monopolies and Commercial Law of the House Judiciary Committee later *expanded the statute to apply to "any civil action."* But the House Report acknowledges that the provision was directed mainly at the dual burden of proof. The government also argues that, because the statute provides that the court "may" order retrial or remand, the power to remand is discretionary and need be exercised only in "special circumstances" where "the interests of justice might warrant a remand." *Nothing in the statute or legislative history indicates that the court has a duty to reach a correct result only in "special circumstances." The statute is more logically interpreted as mandating that the court*

---

correct, both independently and in comparison with the importer's alternative." *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (1984).

[11] 28 U.S.C. § 2643(b) states, "If the Court of International Trade is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision."

> *reach a correct decision in every case*; but the statute leaves to the court the discretion whether it should remand for further proceedings or should reach the correct decision on its own. Remand may not always be the appropriate means for finding the right answer; however, whether the court remands, conducts its own hearing, or simply examines the law and the tariff schedules on its own initiative, it is required to reach a *correct* result.

733 F.2d at 877–78 (first and last emphases in original; citations omitted).

Where, as here, there is no dispute regarding the facts pertaining to BKMY, no deference is owed to agency or lower court legal conclusions, and the sole question for this Court to decide, *de novo*, is whether the CIT has reached the single legally correct classification decision.[12]  While agency fact-findings and policy choices are reviewed under an "arbitrary [and] capricious" standard and discretionary decisionmaking is reviewed for "abuse of discretion," *see, e.g.*, *Deribeaux*, 717 F.3d at 1366, the "not in accordance with law" standard is applied only to agency conclusions of law, such as classification determinations.

An agency decision "is 'not in accordance with the law' when it is in conflict with the language of the statute relied upon by the agency." *City of Cleveland v. Ohio*, 508 F.3d 827, 838 (6th Cir. 2007).  "Plain errors of law" are set aside even under the arbitrary, capricious, abuse of discretion and not in accordance with law

---

[12] The CIT's decision suggests, without holding, that there may be one sustainable classification decision in a case involving a ruling based on an administrative record, and a different "correct" result in cases decided on a *de novo* court record. This is simply an untenable proposition; a single standard exists in all classification cases, namely, whether which classification is the legally correct one.

standard.  *New York v. NRC*, 589 F.3d 551, 554 (2d Cir. 2009); *see EMR Network v. FCC*, 391 F.3d 269, 272–73 (D.C. Cir. 2004).  In this Circuit, the test, while often deferential, "contemplates *de novo* review of questions of law."  *Kent v. Principi*, 389 F.3d 1380, 1384 (Fed. Cir. 2004)).

At the Revocation Ruling's heart is a question of tariff classification.  Where, as here, the nature of the merchandise is agreed and there is no triable issue of fact, the matter reduces to a pure question of law.  *Michaels Stores, Inc. v. United States*, 931 F. Supp. 2d 1308, 1312–13 (Ct. Int'l Trade 2013).  The *Jarvis Clark* rule requires this Court to reach the single correct legal decision in every classification case, whether through determination *de novo*, or through remand to the agency.  The notion that a tariff classification may be upheld if an agency provides a "reasonable" or "persuasive" explanation, or that a reviewing court should defer to CBP on that basis, is inconsistent with both the nature of the HTSUS and the reviewing Court's duty to determine whether the classification is "in accordance with law."

The HTSUS is more than a listing of commodities; it is a self-contained classification system designed always to establish a *single* correct classification for an item.  Frequently more than one tariff provision will describe a product, but under the statute only one will be legally correct.  The HTSUS contains section and chapter notes, General Rules of Interpretation (GRIs), U.S. notes, and subheading

notes—all of which are designed to break ties, winnow out possible, even plausible alternatives, and fix a single correct classification. These tie-breakers may operate by fiat—for example, a chapter note that excludes certain goods from classification thereunder—by examining the specificity of language in the competing provisions (GRI 3(a)), or by assessing characteristics of the merchandise (GRI 3(b)). Indeed, when other rules cannot "break the tie," the law may simply decree the product to be properly classifiable under the competing heading which occurs last in numerical order (GRI 3(c)). To sustain a classification because it seems merely "plausible" or because a product falls *prima facie* within the scope of a tariff provision is to disregard the operating scheme of the law itself. Refusal to resolve a perceived ambiguity, as the CIT did here, is not a determination of whether CBP's classification is "in accordance with law"; it is a refusal to consider the law.

Thus, in *Bauer Nike Hockey USA, Inc. v. United States*, 393 F.3d 1246 (Fed. Cir. 2004), CBP classified imported hockey pants with protective inserts as woven apparel of HTSUS 6211.33.00, while the importer sought treatment as sports equipment of HTSUS 9506.99.25. This Court found the Government's classification reasonable, as the garment was *prima facie* classifiable under heading 6211, but not legally correct, since the goods were also *prima facie* classifiable in heading 9506; the "relative specificity" rule of GRI 3(a) dictated that the Court "break the tie" by identifying the single legally correct classification. *Id.* at 1252–53.

One legal commentator, now a CIT judge, noted that deference to CBP's interpretation would rarely, if ever, provide an appropriate basis for reaching a classification determination—

> With such an array of specific interpretative tools, general rules of statutory interpretation and the availability of a holistic approach in the final analysis, it seems probable that *Chevron*, step two, often need not be reached in customs cases. [T]he infinitely changing number of products and customs issues cautions that Congress could not have always spoken to the precise issue at hand. But, because of these same factors, it seems Congress already had devised a unique methodology to account for its institutional inadequacies.

Claire R. Kelly, *Remnants of Customs Litigation: Jurisdiction and Statutory Interpretation*, 26 Brook. J. Int'l L. 861, 891 (2001) (footnote omitted).[13]

The CIT suggested that Appellant had subjected itself to a different standard of law by bringing this action as a challenge to a ruling (under § 1581(i)) rather than to a denied protest (under § 1581(a)).  The CIT's refusal to resolve ambiguity was preceded by a statement that Appellant "opted for this route of administrative and judicial process," App. 15, suggesting that a different standard of legal interpretation—of classification—applies in ruling challenges than in protest disputes.  By treating CBP's legal conclusions as though they were findings of fact or policy choices, and by refusing to consider whether they were in "accordance with law"—

---

[13] "'The fact that there are two possible definitions does not in and of itself render the statute ambiguous. It is well settled that ambiguity is a creature not of definitional possibilities but of statutory context.'" Kelly at 891 n.154 (quoting *Marcor Dev. Corp. v. United States*, 926 F. Supp. 1124, 1129 (Ct. Int'l Trade 1996)).

the whole law, in this case, the HTSUS—the lower court failed to apply the proper APA standard of review.

## II. The CIT Erred in Ruling that the Subject Yarn Was Not "Metalized Yarn" of Heading 5605.

The Revocation Ruling for the first time injected several limitations and conditions on the classification of "metalized yarns" in heading 5605—none of which is found in the language of the statute, the ENs, or principles of statutory construction. Specifically, CBP asserted that, (1) although an *eo nomine* provision, heading 5605 does not cover metalized yarns made using the BKMY process; (2) metalized yarns of heading 5605 must have visible metallic properties and be decorative; and (3) metalized yarn must contain an unstated "minimum" quantity of metal powder, performing some utilitarian function. The CIT, applying an "arbitrary and capricious" standard of review, rather than the "not in accordance with law" standard, upheld all of these novel conditions.

In each of these findings, CBP and the lower court erred as a matter of law. There is no basis in law for CBP or the courts to read in to a tariff provision conditions or requirements not specifically found therein or fairly implied by the statutory language, especially where CBP is apparently motivated by nothing more than a desire to maximize its revenues.[14]

---

[14] Thus in *Clarendon Marketing*, *supra*, 21 C.I.T. 59, an importer entered certain hydrocarbons under a tariff provision for "naphthas," paying a relatively

## A. Requirements for Classification as "Metalized Yarn" of Heading 5605 Are Clearly Spelled Out in the Statute.

Absent contrary legislative intent, goods are to be classified in their condition as imported. *United States v. Citroen*, 223 U.S. 407, 414–15 (1912). HTSUS 5605.00.90, under which Appellant claims classification, has highly specific requirements, all of which BKMY satisfies as imported. Heading 5605 covers—

> Metalized yarn, whether or not gimped, being textile yarn, or strip or the like of heading 5404 or 5405, combined with metal in the form of thread, strip or powder or covered with metal.

This brief description contains detailed requirements for classification under the heading. First, the yarn must be a "textile yarn, or strip or the like of heading 5404 or 5405," which means that it must be a synthetic or artificial monofilament yarn of a minimum linear mass density and maximum cross-sectional dimension.[15] A

---

low rate of duty. CBP classified the goods under an "actual use" tariff provision for "motor fuels," at a much higher rate of duty, even though the importer had not submitted the required use certification. Since the actual use provision carried a higher duty rate, no importer had any incentive to file the certification regardless of how the product was used. The CIT properly rejected the government's efforts to have the tariff provision in question interpreted as an "actual non-use" provision, requiring the importer to satisfy conditions not appearing in the statute. The CIT also rejected CBP's effort to inject "use" conditions into an otherwise *eo nomine* classification provision.

[15] Heading 5404 covers " Synthetic monofilament of 67 decitex or more and of which no cross-sectional dimension exceeds 1 mm; strip and the like (for example, artificial straw) of synthetic textile materials of an apparent width not exceeding 5 mm"; heading 5405 covers "Artificial monofilament of 67 decitex or more and of which no cross-sectional dimension exceeds 1 mm; strip and the like (for example, artificial straw) of artificial textile materials of an apparent width not exceeding 5 mm." Tex is a unit equal to one gram per kilometer.

"monofilament" is a single-stranded polymer filament whose dimension is determined at the time of extrusion. It is undisputed on the record that BKMY satisfies all of these conditions.

Second, as imported the monofilament must be "combined with metal in the form of thread, strip or powder or covered with metal." The provision not only requires combination of the yarn with the metal, but requires that the metal be in a specified form—thread, strip, or powder. Other forms of metal will not qualify a yarn for classification under heading 5605.[16] BKMY unquestionably features a monofilament combined with metal powder, and thus comes within the literal terms of the provision.[17]

As heading 5605 contains exacting requirements, the issue is whether CBP and the CIT properly identified three additional, unspoken requirements for classification therein concerning (1) the method of manufacture, (2) use, and (3) an unstated *de minimis* metal content. Appellant submits that there was no basis in law for any of these additional "requirements."

---

[16] The CIT noted *HQ 952934* (July 19, 1993) for the proposition that yarns combined with metal used for non-decorative purposes are not encompassed within heading 5605. However, the yarn in that ruling was disqualified from heading 5605 because the metal was in a form—fibers—not allowed by the heading.

[17] Heading 5605 does limit the form in which metal is combined to "thread, strip or powder" or to yarns that are "coated" with metal.

### B. The CIT Erred in Holding that the *Eo Nomine* Provision for "Metalized Yarn" in Heading 5605 Did Not Cover All Forms of Metalized Yarns Within the Statute's Requirements.

The Revocation Ruling disregards the rule that, absent clearly-expressed Congressional intent, an *eo nomine* tariff provision covers *all forms* of the named article, including forms developed after the adoption of the tariff. *See NEC Am., Inc. v. United States*, 8 C.I.T. 184, 186 (1984) (the tariff embraces "articles produced by technologies which may not have been employed or known to commerce at the time of the enactment") (citation omitted), *aff'd*, 760 F.2d 1295 (Fed. Cir. 1985); *see also Nidec Corp. v. United States*, 68 F.3d 1333, 1336 (Fed. Cir. 1995). Heading 5605 is an *eo nomine* provision "describ[ing] a commodity by a specific name, usually one common in commerce. Absent limiting language or indicia of contrary legislative intent, such a provision covers all forms of the article." *Nidec*, 68 F.3d at 1336. While heading 5605 sets out precise requirements for classification thereunder, it contains no limitations on the method by which metalized yarns are produced. It is not a use provision, nor does it require that the metal impart visual properties.[18] Nor is it subject to an unstated *de minimis* limitation on its metal content.

---

[18] In this regard, heading 5605 should be contrasted with the rubber or plastic coated textile materials of heading 5604 which, according to Note 4 to HTSUS Chapter 56, must have an "impregnation, coating or covering" that can be "seen with the naked eye."

Metalized yarns have been known for millennia. App. 83a–85a. Scholars believe the "Golden Fleece" that Jason and the Argonauts pursued in Greek mythology was a metalized yarn garment—a metaphor for royal power. *See, e.g.*, David Braunde, *Georgia in Antiquity: A History of Colchis and Transcaucasian Iberia, 550 BC–AD 562* (1994). The Book of Exodus speaks of metalized yarns:

> They made the ephod of gold, and of blue, purple and scarlet yarn, and of finely twisted linen. They hammered out thin sheets of gold and cut strands to be worked into the blue, purple and scarlet yarn and linen—the work of trained hands.

*Exodus* 39:2–3; *see also Psalms* 45:13 ("All glorious is the princess within her chamber; her gown is interwoven with gold."). In India's thirteenth century Muslim period, the Sultan of Delhi required permits to buy brocades—fabrics made with silk threads of gold or silver—and employed 4000 silk weavers to make "robes of honor" and "gifts of gold brocade for foreign dignitaries." Kax Wilson, *A History of Textiles* 165 (Westview Press 1979). Elegant medieval textiles featured precious metals combined with yarns, and were known as "cloth of gold." Maria Hayward: *Rich Apparel: Clothing and the Law in Henry VIII's England* (2009). In Tudor England, King Henry VIII limited the wearing of metalized yarn fabrics to royalty and nobility, and lame yarns were popular in the nineteenth and early twentieth centuries. *Id.* at 29, 268.

Methods for producing metalized yarns continue to evolve. In the twentieth century, as synthetic yarns from plastic materials were developed, methods were

developed for producing metalized yarns by combining metal with plastics.  In 1946, "Lurex"—a slit film yarn, App. 88a—was developed by sandwiching metal powder between two plastic films that are then slit to yarn widths (less than five millimeters).  Lurex was followed in 1955 by vacuum-deposited laminates, and in 1963 by vacuum-deposition non-laminates—processes in which metal powders were combined with plastic films.  *See, e.g.*, *Metal Film Co. v. Metlon Corp.*, 316 F. Supp 96, 97–99 (S.D.N.Y. 1970).  CBP recognizes yarns made by these methods as metalized yarns of heading 5605—even since the Revocation Ruling, *see, e.g.*, *NY N246822* (Nov. 13, 2013)—although, at the moment of "combination," metal is being joined not with a textile yarn, but with plastic film.  After being slit, these products are textile "yarns" in their condition as imported into the United States, falling within heading 5605's dimensional and physical parameters for "metalized yarns."

Best Key makes metalized yarns by combining metal powder not with plastic *film*, but with plastic *liquid*.  Yarn dimensions are achieved not by slitting but by extrusion through a spinneret—the conventional way for making man-made fiber yarns.  While new as applied to metalized yarns, the method is hardly unanticipated.  Despite last century's progress, metalized yarns remain bulky and unsuitable for use against the skin.  Industry has always sought to reduce their abrasive texture.  *See Metlon* at 98 (noting "the need for a softer material" and how the de-

velopers' resultant metalized yarn "was still not soft enough a material for use in fabrics that would come in contact with the wearer's skin").

As the agency record reflects, when the HTSUS was adopted, researchers sought to produce metalized yarns "directly from the liquid phase." Grayson at 231 (App. 61a). Appellant accomplished this using metal nanopowders, an increasingly popular process. As noted by S.S. Chinchwade and Mahmeet Srivastava in *Application of Nanometals in Textiles—Part 1*, Textile Review, Apr. 2012 (App. 156a)—

> Research is going on around the world to explore the application of nanomaterials, nano-finishing, nano-coating, nanofibres, etc. to develop innovative new products with significantly improved performance properties and functionality of textile fibers and fabrics. … They are being used in UV protection, water repellency, antibacterial activity, antistatic performance, EMI shielding, wrinkle resistance, stain resistance performance, battle dress formation, etc. Nano sized materials are able to enhance the physical properties of conventional textiles. In the future, the application of these wonder nano-particles can be extended to produce textiles with health care & self cleaning function.

*See also* Will Soutter, *Nanotechnology in Textiles* (2012) (App. 157a–59a); M. Joshi et al., *Characterization for Nanotechnology Applications in Textiles*, 33 Indian J. Fibre & Textile Res. 304 (2008) (App. 160a); Katherine Bourzac, *Spinning Nano Yarns: A Method for Turning Powders into Fibers Has Many Potential Applications*, M.I.T. Tech. Rev., Jan. 7, 2011 (App. 161a–62a).

Although neither the statute nor its ENs limits the methods whereby metalized yarns can be manufactured, the CIT left undisturbed CBP's unsupported hold-

ing that Appellant's method was not a permissible way to make a metalized yarn of heading 5605. CBP asserted, without reasoning, that BKMY did not consist of "textile yarn" that was "combined with metal." App. 15. If the metal must be combined with a pre-existing "textile yarn" to be classified under heading 5605, then Lurex and vacuum deposition yarns, all made by combining metal powder with plastic film, would also be disqualified. Yet all of these products are covered by the heading.

Where Congress intends to limit a tariff provision to goods produced by a specific method,[19] or to goods "combined" using specified processes,[20] it knows how to say so. There is no such limitation here. While heading 5605 requires that, as imported, metalized yarns be "combined with" metals of certain *forms* ("thread, strip or powder"), there is no express or implied limitation on the *method* of combination. Absent clear and contrary legislative intent, tariff terms are to be construed in accordance with their common meaning. *Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999). The *Merriam-Webster Online Dic-*

---

[19] *See, e.g.*, HTSUS headings 3101 (fertilizers "produced by the mixing or chemical treatment of animal or vegetable products"); 3805 (turpentine "produced by the distillation or other treatment of coniferous woods"); 4807 (composite paper and paperboard "made by sticking flat layers of paper or paperboard together with an adhesive").

[20] *See e.g.*, HTSUS heading 3920 (plastic "not reinforced, laminated, supported *or similarly combined* with other materials" (emphasis added)).

*tionary*, http://www.merriam-webster.com (last visited May 5, 2014) defines "combine" as "to bring into such close relationship as to obscure individual characters; and the *Cambridge Dictionary Online*, http://dictionary.cambridge.org/us/ (last visited May 5, 2014), as meaning "to unite or to join together as to make a single thing or group." The BKMY process does exactly that: it combines plastic and metals homogeneously, forming a synthetic textile monofilament by a process of extrusion through a spinneret. The yarn and metal are intimately and inseparably joined, in their condition at the time of importation.

While paying lip service to the "condition as imported" rule, and stating that the method of manufacture is not determinative of classification in this case, the CIT elected to "defer" to CBP's interpretation of what it considered an "ambiguity" in the statute. The Revocation Ruling had held—

> We agree that it is the nature of the product rather than the process of manufacture which is the key consideration in determining whether the product is classifiable in heading 5605. Thus, whether the instant product is a metalized yarn depends on the meaning of that term as used in heading 5605. The term "metalized yarn" is defined in heading 5605, HTSUS as "being textile yarn, or strip or the like of heading 5404 or 5405, combined with metal in the form of thread, strip or powder or covered with metal." The instant product is not a textile yarn or strip combined with metal powder. The yarn itself contains metal, but *it was not combined with metal in any way*; the polyester slurry was combined with metal prior to the spinning of the yarn. Whether a polyester slurry falls within the meaning of "or the like" is unclear from the legal text alone.

App. 53a–54a.  CBP's conclusion is exactly wrong.  BKMY *is* a textile monofila-ment yarn combined with metal powder.  To say that the yarn was not combined with metal in any way is simply disingenuous, when the agency's own laboratory tests confirm the added metal powders to be inseparably joined to the monofila-ment.  *Id.* at 106a–08a.  CBP's notion that heading 5605 requires that metal be combined with a preexisting textile yarn is refuted by the Explanatory Notes, which describes the "Lurex" process noted above, and by dozens of CBP Head-quarters Rulings in which CBP has held yarns produced by combining metal pow-ders with plastic film to be classified as "metalized yarns" of heading 5605.

Even assuming an "ambiguity" in the law existed, the CIT abdicated its re-sponsibility to resolve it.  Rather than interpreting the statute, the Court held that both CBP's and Appellant's interpretations were "possible," and "the statute is ambiguous to that extent."  App. 15.  Disregarding the *Jarvis Clark* rule, the CIT held that "it is not the court's function in this proceeding to resolve that ambigui-ty," *ibid.*  Rather, the Court said it was not "persuaded that the process of 'be-ing … combined' is 'irrelevant' to that determination and an erroneous interpreta-tion of the statute," *ibid.* (omission in original), making no effort whatsoever to parse the statute.[21]  This was clear legal error, and an abandonment of the judicial

---

[21] While citing (App. 15) to *Rifkin Textiles Corp. v. United States*, 297 F. Supp. 1127, 1134 (Cust. Ct. 1969), which held that when a reviewing court is "not entirely certain of the meaning of the statutory language when applied to the par-

function.  *See Jarvis Clark*, 733 F.2d at 878 ("[W]hether the court remands, con-
ducts its own hearing, or simply examines the law and the tariff schedules on its
own initiative, it is required to reach a *correct* result" (emphasis in original).).  The
CIT ducked that obligation here.

This holding, if left undisturbed, would create two separate universes of cus-
toms law: one universe, where cases are brought to the CIT via protest, and the
court has the duty to interpret terms and reach the single correct result, and a "def-
erential" universe, where issues arise under the CIT's residual jurisdiction, the
court need not find the correct result, and a classification that may not be correct,
but is "good enough" for deferential review, is upheld.  *Jarvis Clark* rejects such a
possibility.

The ENs to heading 5605 provide exemplars of methods for producing met-
alized yarns, but not limitations.  The Revocation Ruling, by trying to interpret the-
se exemplars as limitations on the coverage of the heading, committed legal error
of a kind which this Court expressly rejected in *Midwest of Cannon Falls v. United
States*, 122 F.3d 1423, 1428 (Fed. Cir. 1997), where "[a]bsent a clearer showing of

_____

ticular facts of this case," the court must "resort to pertinent authoritative materials
to determine the meaning of the term," the CIT refused to do that in this case. "The
plaintiff opted for this route of administrative and judicial process," the CIT noted,
and apparently forfeited its right to judicial interpretation of tariff terms, since the
lower court held it was "not the court's function in this proceeding" to resolve per-
ceived ambiguities" in the statute. App. 15.

congressional intent," the Court "refuse[d] to import incidental characteristics of the examples of the explanatory notes into the headings of the HTSUS."

The meaning of an *eo nomine* designation is determined as of the effective date of the tariff, but includes all articles subsequently created that fairly come within its scope. *Hoyt, Shepston & Sciaroni v. United States*, 52 C.C.P.A. 101, 103–04 (1965); *Sears, Roebuck & Co. v. United States*, 46 C.C.P.A. 79, 82–83 (1959). Where, as here, there is no evidence that Congress intended to limit the application of a tariff heading, the courts will not apply a restrictive interpretation. *See, e.g.*, *Chevron Chem. Co. v. United States*, 23 C.I.T. 500, 505 (1999).

A tariff provision will encompass a future-developed version of a product if the product bears an "essential resemblance" to the goods or exemplars identified in the tariff heading. As this Court instructed in *Brookside Veneers, Ltd. v. United States*—

> "[T]ariff terms are written for the future as well as the present," and, absent contrary legislative intent, *"can be expected to encompass merchandise not known to commerce at the time of their enactment" provided the new articles bear an "essential resemblance" to the article in the statute*. To assist it in ascertaining the common meaning of a tariff term, the court may rely upon its own understanding of the terms used, and it may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources.

847 F.2d 786, 789 (Fed. Cir. 1988) (emphasis added; citations omitted). The "essential resemblance" test requires an inquiry into whether the new product satisfies the criteria for classification in the particular heading, which may classify *eo nomi-*

*ne* or by use. *See United States v. Standard Surplus Sales Inc*., 69 C.C.P.A. 34, 40 (1981) ("To be classified under a specific tariff provision, it 'would be sufficient if the new article possessed an essential resemblance to the former exemplars in those particulars *which the statute established as the criteria of the classification*'" (quoting *Klipstein v. United States*, 4 Ct. Cust. 510, 514 (1913)).); *see also United States v. Tex. Instrums., Inc*., 67 C.C.P.A. 59, 63 (1981).

Though produced by a newer method, BKMY satisfies every condition for classification under heading 5605: it is a yarn, permanently combined with metal powder, is a synthetic or artificial monofilament, and is the proper mass and dimension. Appellant's characterization of BKMY as a metalized yarn is confirmed by Professor Johnson of FIT, who makes clear that, (i) the proposed revocation does not accurately describe the commercial or common understanding of metalized yarn, App. 91a–92a (Johnson Aff. ¶¶ 6–7); (ii) BKMY "bears an essential resemblance to metalized yarns known to commerce and science," *ibid.* (Johnson Aff. ¶ 7); (iii) the metal need not create a shiny metallic appearance, *ibid.* (Johnson Aff. ¶¶ 6, 8); (iv) the metal "does not have to be seen by the naked eye," *id.* at 91a (Johnson Aff. ¶ 6); (v) the yarns "may have a soft feel and look, rather than only a harsh metallic appearance like Lurex," *ibid.*; (vi) the production process for metalized yarn is irrelevant, and only the properties of a finished yarn are relevant, *id.* at 91a–92a (Johnson Aff. ¶¶ 7, 9); (vii) at present, nanometal use in textile yarns "is

one of the key developments in textile science," *id.* at 92a (Johnson Aff. ¶ 10); (viii) zinc and aluminum provide antimicrobial properties or increased resistance to ultraviolet radiation, *id.* at 91a (Johnson Aff. ¶ 6); and (ix) metallic yarns are "not limited by the amount of metal present in the yarn" and "may be added at various times during the yarn manufacturing process," *ibid.* CBP introduced to the record no contradictory information.

### C. The CIT Erred in Finding that Heading 5605 Requires Metal Content to Impart Visual Effects or to Serve Specific Functions, Decorative or Otherwise, in the Yarn.

The Revocation Ruling was contrary to law in asserting that the metal powders in BKMY are required to impart a metallic appearance, perform other functions in the yarn, or be used for a decorative purpose. The CIT erred in upholding it.

Heading 5605 is an *eo nomine* provision, which differs from "a use provision" in that it "describes the merchandise by name, not by use," *Carl Zeiss*, 195 F.3d at 1379. The extensive conditions for classification of goods under heading 5605 are set out in the statute. Had Congress wished to impose other requirements for classification in that heading, it could have done so. It did not.

CBP's Revocation Ruling, however, asserts that yarns of heading 5605 must have visually discernible metallic qualities, and be used for decoration, rather than apparel applications. Conceding that Appellant's "yarn itself contains metal," CBP

claims it cannot be classified under heading 5605 because "[t]he presence of the metal is not discernible except by laboratory testing," the yarn is not "used primarily for decorative purposes," and it lacks a "distinctive metallic appearance." App. 55a. Yet nothing in the statute requires, or in the Explanatory Notes suggests, that metalized yarn have any of these properties.

The CIT suggested that the metal in BKMY must have some functional capability, imparting a quality which "if … not obviously discernable [*sic*], … must at least be measurable," App. 24, and that Appellant bears a burden of satisfying "at least a minimum threshold or quantum of proof that the imparted, desired quality is in fact imparted," *id*. at 24–25.

However, this Court has uniformly struck down efforts to inject use requirements into *eo nomine* provisions, or to impose conditions for classification not expressly stated in the statute—and has done so specifically in the case of synthetic monofilament yarns. *Baxter Healthcare Corp. of Puerto Rico v. United States*, 182 F.3d 1333 (Fed. Cir. 1999) concerned the classification of a 0.4mm synthetic monofilament yarn having a linear density greater than 67 decitex. CBP classified the yarn under heading 5404—requirements also satisfied by BKMY. The plaintiff argued that its product could not be classified under heading 5404 because it had low tensile strength, had not been subjected to a drawing step, and was not intended for a "textile use." The Government argued, correctly, that the term

"synthetic monofilament" "simply means one filament, without any particular tensile strength or drawing requirements," *id.* at 1338. This Court agreed, holding that heading 5404 could not be interpreted as having strength, drawing, or *use* requirements.

Nothing in heading 5605 or its ENs supports any of the new and additional conditions for classification posited by the Revocation Ruling. CBP itself has never required a metalized yarn to have a visibly metallic or shiny appearance. Thus, for example in *NY A88665* (Oct. 25, 1996), two yarns neither described as shiny or metallic were classified in heading 5606. In *HQ 964997* (May 20, 2002), "tinsel conductors," used to carry low levels of electrical current, and having neither a shiny metallic appearance, nor a "decorative" use, were classified as metalized yarns. Nor does metal need to be visible to the naked eye. In many Lurex yarns, metal is sealed away behind colored film, and the "shiny" appearance of the yarn is imparted by the film. App. 88a. Had Congress intended the metal in yarns to impart a visible effect, if would have so specified, as it did with the coated textiles of heading 5604, or would have provided in heading 5605 for "metallic" yarns, rather than "metalized" ones.[22]

---

[22] Compare the *Merriam-Webster Online Dictionary* (last visited May 5, 2014) definition of "metallic" ("3. resembling metal as (a) having iridescent and reflective properties" with the same *Dictionary*'s definition of "metalize" ("to coat, treat, or combine with a metal"). The drafters of heading 5605 chose the word

Although the record confirmed that metalizing yarns imparts antimicrobial or ultraviolet protective qualities, *id.* at 91a (Johnson Aff. ¶ 6), neither quality is a condition precedent to classification under heading 5605. The lower court erred in requiring that Appellant prove or quantify that its BKMY had such qualities.

### D.    CBP and the CIT Erred in Implying the Existence of a Minimum Metal Content Requirement for Yarns of Heading 5605.

CBP cited no authority for its newly-minted condition that metalized yarns must have some (albeit unspecified) minimum metal content. That the condition is novel for CBP is evident by reference to the agency's Informed Compliance Publications (ICPs), one of which states, "A yarn that contains any amount of metal, no matter how small that amount of metal, is regarded in its entirety as 'metallized yarn.'"[23] A more recent ICP stated even more emphatically (emphasis added)—

> Often, the actual amount of metal present is quite small in relation to the weight of the textile fibers. However, in general, any of these yarns that have metal present, whatever the proportion of metal present, is classified as a metalized yarn under heading 5605. See Note 2(B)(a) to Section XI.
>
> When classifying a fabric, etc., made from such metalized yarn, we count the entire weight of the metalized yarn as "other" textile fibers

---

"metalize," which signifies combination with metal, rather than the word "metallic," which could be taken as a reference to specific properties.

[23] U.S. Cust. & Border Prot., *What Every Member of the Trade Community Should Know About: Classification: Apparel Terminology under the HTSUS* 9 (June 2008) (App. 163a–64a), *available at* http://www.cbp.gov/sites/default/files/documents/icp057_3.pdf.

> when making any "chief weight" determination (reference: HQ 084861 and HTSUS Section XI, Note 2(B)(a)).
>
> TO SUMMARIZE: for classification purposes, metalized yarns are considered "other" textile fibers, and these yarns are treated that way *no matter how little metal is present*.[24]

The record shows BKMY to contain metal content (roughly 0.7% by weight), which is approximately the same as for many Lurex-type metalized yarns. CBP's classification rulings have similarly confirmed that "a yarn that contains any amount of metal is considered in its entirety as a 'metalized yarn' for tariff purposes." *See NY J82790* (Apr. 3, 2003). In determining whether a yarn is a "metalized" yarn, CBP does not consider the weight of the metal, but whether the yarn contains any metal. *See e.g.*, *NY N034758* (Aug. 15, 2008); *NY L86561* (Aug. 8, 2005); *NY F83891* (Mar. 7, 2000). The ENs to heading 5605 confirm that the heading covers combinations of yarns with metal "whatever the proportion of the metal present."

While the Revocation Ruling said that CBP "does not impose a strict requirement with respect to the amount of metal that must be present in order for a yarn to be considered metalized," it posits that the quantity of metal in BKMY is insufficient to classify the goods involved under heading 5605. No sufficient level

---

[24] U.S. Cust. & Border Prot., *What Every Member of the Trade Community Should Know About: Classification of Fibers and Yarns under the HTSUS* 17 (Sept. 2011) (App. 165a–66a), *available at* http://www.cbp.gov/sites/default/files/documents/icp005r2_3.pdf.

is ever identified.[25]  For its part, the CIT declined to identify a *de minimis* level of metal in yarn, while accepting CBP's implication that there is one, and concluding, without citation to authority or the record, that to classify in heading 5605 any fiber "with as little metal as in present in the instant yarn … would expand the heading far beyond its current scope," App. 25.  The CIT posited that yarns containing "trace amounts" of metal might not be classifiable in heading 5605, and suggests that in Appellant's view "a couple of atoms" of metal might suffice.  *Ibid.*  Appellant never made such an argument and in fact its yarns contain a level of metal content commensurate with that of many Lurex and similar yarns.

The canon *de minimis non curat lex*—"the law does not concern itself with trifles"—is one rule by which all legislation is judged, and which all enactments are deemed to accept.  *Wis. Dept. of Revenue v. Wm. Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1999).  Its application to tariff classification is well accepted.  But this Circuit has made it clear that the rule is only applied to the customs laws when its application will promote the statutory purpose.  *Alcan Aluminum Corp. v. United*

---

[25] Of course, if CBP believed that BKMY was disqualified from classification under heading 5605 by reason of the way the metal is combined with plastic materials, one wonders why the level of metal in the product—commensurate with that of many Lurex yarns—would be at all material, much less relevant, or why the use or visual characteristics of the product would matter. Best Key might be forgiven for believing that CBP's Revocation Ruling, driven by a fear that widespread use of BKMY might adversely impact duty collections on apparel products, App. 153a–54a, employed the approach of flinging claims at the wall in the hope that one or more might stick.

*States*, 165 F.3d 898, 903 (Fed. Cir. 1999).  In the instant case, the drafters of the tariff quite clearly did not intend for the rule to be applied to the metalized yarn provision of heading 5605.  Headings 5404 and 5405 already cover, in some detail, synthetic and artificial monofilament of a specified linear mass and diameter.  Yet Congress created an additional classification, heading 5605, which covered such yarn "combined with metal" in certain forms.  The ENs to the heading indicate that yarns are to be so classified "whatever the proportion of metal present."  The *Merriam-Webster Online Dictionary* (last visited May 5, 2014) defines the term "whatever" to mean "anything or everything that," with reference to a requirement, or "regardless of what."  This is a strong indication that *no* minimum amount of metal was intended.  For tariff classification purposes, a component or material may be disregarded as *de minimis* if it is merely an incidental or immaterial element of an entire article, does not enhance its value, and has no commercial purpose.  *Tuscany Fabrics Inc. v. United States*, 65 Cust. Ct. 182, 186 (1970).  That can hardly be said of the metal in BKMY; it is intentionally added, through a long-awaited process that represents a technological breakthrough.  It imparts antimicrobial properties to the yarn, App. 64a, 78a, and can also impart ultraviolet protection properties, *id.* at 79a, 91a (Johnson Aff. ¶ 6).  It vastly enhances the salability of the yarn, yielding an antimicrobial metalized yarn soft enough to be worn against the skin.

That garments made in chief weight from the yarn attract a lower rate of duty upon importation into the United States also increases the product's merchantability.

Finally, there is no contention that the BKMY process represents some deceit or artifice that prevents application of the "condition as imported" rule of *Citroen*, *supra*, 223 U.S. 407. The metal is permanently combined with the yarn, cannot be removed,[26] and serves useful functions, even if present in small amounts. There was no basis for either CBP or the CIT to apply, albeit in a muddled way, the *de minimis* rule in this case.

## III. Procedural Irregularities and Substantive Inconsistencies Deprive the Revocation Ruling of Any Claim to *Skidmore* Deference.

The Revocation Ruling deserves no deference under *Skidmore*, *supra*, 323 U.S. 134, 140, which permits non-binding judicial deference to agency rulings based on "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." The ruling was born in falsification, was forged in procedural irregularity, and is plagued by internal and external inconsistencies.

CBP decided to reclassify BKMY when it realized BKMY could be used to make garments that would attract low rates of duty. A CBP Laboratory report pre-

---

[26] That a product cannot be removed from a combination cost-efficiently also indicates that it cannot be disregarded, for tariff classification purposes, as *de minimis*. *See Arbor Foods Inc. v. United States*, 30 C.I.T. 670, 676 (2006).

pared in connection with the Johnny Collar Ruling detected the added nanometal, confirming the results of independent laboratory reports submitted by Appellant. But a "Significant Contact Report" (SCR) (App. 109) indicated that CBP Laboratory and NIS personnel conspired to falsify their ultimate report and to disregard the Yarn Ruling. This remarkable document states—

> I called NIS Mary Ryan today to discuss a Metallic Yarn fabric sample. … Maribeth Dunaski and William Raftery were all present at the time of the conference call. I informed Mary Ryan that in my opinion the sample was not of "metallic yarn". She agreed with me. I mentioned to her about ruling number N187601 which considered this type of yarns "metallic yarn". Mary told me that the purpose of this sample (NY 20120156) is to request H.Q. to reverse the ruling published in ruling number N187601 based on the laboratory report NY 20100156, therefore, I should disregard Ruling # N187601 while writing laboratory report. *It was also decided that the laboratory report number NY 20120156 will only state that sample is wholly of polyester.*

*Ibid.* (emphasis added; deletions omitted; all *sic*). This decision to disregard the Yarn Ruling was a blatant violation of 19 C.F.R. § 177.9(a), which states that a ruling issued by CBP "represents the official position of [CBP] with respect to the particular transaction or issue described therein *and is binding on all [CBP] personnel ...* until modified or revoked" (emphasis added). Of course, CBP ultimately acknowledged the presence of the metal, and revoked—temporarily, at least—the Johnny Collar Ruling. The agency has made no effort to justify its personnel's improper conduct as reflected in the SCR.

CBP committed additional procedural irregularities during the revocation proceeding for the Yarn Ruling. Although the *Customs Bulletin* notice specified the deadline for the submission of comments—and all commenters opposed the revocation—the agency conducted an off-the-record comment procedure for domestic yarn spinning interests. On August 14, 2013, long after the comment period had closed, an attorney from CBP's Office of Rulings and Regulations (ORR), Claudia Garver, reached out to Mr. Hubbard, of NCTO, explaining that "[s]ome of the points received in opposition to our proposed action have some merit, so at the very least, we want to make sure we've got this right," App. 144a, and seeking domestic industry comments on the classification issue.

On September 18, Mr. Hubbard reported to Ms. Garver that he had spoken with "somebody at a fiber company," who had "mentioned that [the company] make[s] a fiber product with silver injected into the polymer to make the yarn antimicrobial," a process similar to Appellant's. *Ibid.*[27]. Then, on September 25—

_____

[27] Interestingly on October 5, 2012—before the commencement of the revocation proceeding at issue—Ms. Garver had already written Mr. Hubbard about putting materials in polymers for extruding polyester yarns. App. 143a. Mr. Hubbard responded—

> That is a great question. I was thinking this through after a conversation with a guy yesterday (he has fiber that incorporates crystal quartz the way you describe)—I was wondering how he will classify it when he brings it to market. My understanding of metalized yarns is similar to the traditional descriptions that Customs has handled in the past.

*Id.* at 142a.

*after* the September 17 date ascribed to the Revocation Ruling, but before its October 2 publication date—Ms. Garver held a telephone conference with Mr. Hubbard and Unifi's Meredith Boyd and Jane Johnson, respectively a chemist and government relations executive, alongside possibly "about 5 to 6 people … , mainly National Import Specialists," to solicit *ex parte*, off-the-record comments on the classification issue presented. *Id.* at 146a–47a. The only summary of this *ex parte* conference appears in a September 25 message from Mr. Hubbard to Ms. Garver in which Mr. Hubbard (1) states that his industry *does not* have a fixed definition of what defines "metalized" yarn"; (2) mentions NCTO's and its members' policy concerns indirectly related to the classification of metalized yarns; and (3) asks CBP to spare the domestic industry from a "double whammy" if Appellant's yarns are ruled to be "metalized yarns":

> Based on what Meredith [Boyd] said about trace metals existing in any yarn, our industry definitely needs a solid definition of "metalized." My concern is that importers could claim that products are made from "metalized" yarn based on the knowledge that trace metals are in the yarn and therefore circumvent the intended rules in our free trade agreements. In agreements like NAFTA, DR-CAFTA, etc., the rules of origin for textiles and apparel generally require originating yarns for goods of HTS Chapters 50–55 and 60. If metalized yarns of Chapter 56 are used, the yarn could come from anywhere in the world. The domestic industry and our partners in the region would face a double whammy: the company brings in low-grade yarn at a lower duty rate than typically staple of filament yarn, then the importer gets to claim duty free benefits for goods made from that yarn.

*Id.* at 148a. Thereafter, CBP published the Revocation Ruling, dated the week prior. In retrospect, it appears that the agency outsourced the decision to domestic yarn-spinning interests, rather than applying law and precedent.

The doubtful provenance of the Revocation Ruling and the unlawful *ex parte* comment proceeding suggest that the ruling should not receive *Skidmore* deference. The "validity of the reasoning" in the ruling is almost non-existent. CBP suggests that heading 5605 requires metal to be combined with a pre-existing yarn, while disregarding dozens of its own "Lurex" rulings in which metal powders are combined with plastic, rather than yarn. CBP's claim that some unspecified minimum quantity of metal must be present in the yarns of heading 5605 is squarely at variance with the agency's prior practice and statements made in its Informed Compliance Publications. There is simply no consistency with prior publications and practice.

Nor does "thoroughness evident in the agency's consideration" support granting *Skidmore* deference. While CBP found "merit" in the comments opposing revocation of the Yarn Ruling, the agency did not act on that merit, but instead conducted an off-the record solicitation of comments from purely domestic interests. Those interests didn't establish that BKMY to be anything other than a "metalized yarn," but asked CBP to spare them the harm that might befall their advantages under certain trade agreements. App. 148a. CBP's decision to conduct

an off-the-record comment proceeding is by itself "intolerable," and sufficient to render the Revocation Ruling and proceedings arbitrary and capricious. *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 54 (D.C. Cir. 1977).[28]  There are at least two instances where Mr. Hubbard references metal being added to a slurry *before extrusion*. App. 142a, 144a. CBP's willful blindness to this information shows a lack of thoroughness in preparation of the Revocation Ruling. Indeed, the *ex parte* CBP communications after the close of the comment period would not have come to light had Appellant not sued to challenge the ruling. Upholding that ruling would render impotent the notice and public comment provisions of § 1625(c), the purpose of which "is to provide importers with security and stability regarding Customs's policies and practices, and … transparency when CBP decides to change" them. *Int'l Cust. Prods. v. United States*, 32 C.I.T. 302, 307 (2008); *see also Customs Modernization and Informed Compliance Act: Hearing on H.R. 3935 Before the Subcomm. on Trade of the H. Comm. on Ways & Means*, 102d Cong. 91 (1992) (statement of Carol Hallett, Comm'r, U.S. Cust. Serv.) ("Importers have the right

---

[28] The Revocation Ruling claimed that the American Fiber Manufacturers Association (AFMA) joined with NCTO's statement that the textile industry considers a metalized yarn to be either a textile yarn covered or coated with metal, or a plastic film deposited with metal and slit into yarn. AFMA in fact never communicated directly with CBP, and NCTO indicated that other companies used metalized yarn production methods similar to the BKMY method.

to … expect certainty that the ground rules will not be unilaterally changed by Customs").

That CBP was motivated by concerns rather than the law is suggested by a communication from the NIS staff to CBP Headquarters providing estimates of potential revenue losses if BKMY were classified as metalized yarn, and noting that metalized yarns satisfy tariff shift rules under various free trade agreements.  App. 150a–54a.

## IV. The Lower Court Erred as a Matter of Law in Denying Appellant's Motion for Unredacted Versions of the Administrative Record.

Finally, the CIT erred by granting the Government's dubious claim to "deliberative process privilege" for much of the administrative record.  The CIT entered an expedited schedule in this case ordering the Government to "file the Administrative Record on or before November 8, 2013," on which date the Government filed a 500-page record.  On the afternoon of November 15, when Best Key's motion for judgment on that record was due, the Government, without notice or leave, filed an additional 157 pages it claimed "were considered by [Customs] in the decision to issue HQ H202560, " App. 167a.  This forced Appellant to make an emergency application to extend its briefing deadline.  Appellant moved, unsuccessfully, to have two categories of the supplemental documents stricken from the

record,[29] and filed its motion. On November 27 the Government moved to supplement the record yet *again* to include "*documents that were directly or indirectly considered in its decision to issue HQ H202560* but contain information that that reflects pre-decisional analysis, expressions of opinions, recommendations, and/or views of agency personnel. Consequently, additional review of those documents was necessary to isolate and redact the deliberative content." App. 168a–69a. Appellant objected, because (1) the information had been filed after briefing commenced, (2) no privilege log or other justification for the privilege claim was filed as required by court rules, and (3) CBP did not provide Appellant with unredacted copies of the record, pursuant to the court's judicial protective order (JPO).

Appellant moved to compel production of the unredacted record. At hearing, the CIT first ordered the government to provide the unredacted records to Best Key, then belayed that order pending its *in camera* review thereof. The Government then filed a belated privilege claim, although it never provided a privilege log from which Appellant might be able to comment on the appropriateness of the claims. The Court conducted a very quick, *in camera* review of the unredacted documents, and the next day issued an opinion sustaining all of the privilege claims, stating:

---

[29] These were (i) records of certain *ex parte* discussions conducted after the close of the comment period and (ii) certain CBP documents pertaining to merchandise other than that involved in this case.

> [A]ll of the claimed redactions are predecisional and deliberative,
> and … none may fairly be characterized as "final" in the sense of hav-
> ing been adopted formally or informally within the contours of the
> Revocation Ruling or as having expressed the "working law" of Cus-
> toms. Some documents also express communications over which the
> attorney-client privilege attaches. Customs has not abused its discre-
> tion in redacting parts of the final supplement to the administrative
> record from public scrutiny.

*Best Key Textiles Co. v. United States*, Slip Op. 13-145, at 3 (Ct. Int'l Trade Dec.

4, 2013) (internal citations omitted).

The deliberative process privilege allows agencies to withhold from public

disclosure inter- or intra-agency documents that are both "(1) 'predecisional,' *i.e.*,

'prepared in order to assist an agency decisionmaker in arriving at his decision,'

and (2) 'deliberative,' *i.e.*, actually … related to the process by which policies are

formulated.'" *Nat'l Council of La Raza v. DOJ*, 411 F.3d 350, 356 (2d. Cir. 2005)

(omission in original) (quoting *Grand Cent. P'ship Inc. v. Cuomo*, 166 F.3d 473,

482 (2d. Cir. 1999)). It is most often exercised in connection with requests for dis-

closure of documents under FOIA, 5 U.S.C. § 552(b) (2009), which allows an

agency to withhold only if the claim of privilege is supported by an appropriate

privilege log—known as a "Vaughn Index." According to *Military Audit Project

v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981), the deliberative process privilege

applies only to sworn statements offered in support of the claim of privilege that

"describe the documents and the justifications for nondisclosure with reasonably

specific detail, demonstrate that the information withheld logically falls within the

claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.". *See also Life Extension Found., Inc. v. IRS*, 915 F. Supp. 2d 174, 184 (D.D.C. 2013) (noting a claim to withhold documents under the deliberative process privilege "goes through the record page-by-page").

Like other privileges, the deliberative process privilege is designed to exclude evidence, and therefore, must be narrowly construed. *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 868 (D.C. Cir. 1980); *see also United States v. Nixon*, 418 U.S. 683, 709–10 (1974). The privilege may also be lost under certain circumstances, including, for example—

> (1) when the contents of the document have been "adopted, formally or informally, as the agency position on the issue or [are] *used by the agency in its dealings with the public*"; and (2) when the document is more properly characterized as an "opinion[] [or] *interpretation which embod*[*ies*] *the agency's effective law and policy*," in other words, its "working law."

*Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. DOJ*, 697 F.3d 184, 195 (2d Cir. 2012) (emphases added; internal citations omitted; omissions in original). The initial burden of establishing the privilege is on the government, *Schreiber v. Soc'y for Sav. Bancorp, Inc.*, 11 F.3d 217, 221 (D.C. Cir. 1993), and the initial burden includes an obligation to submit a privilege log that outlines the various claims of privilege, and the specific information redacted thereunder. U.S. Ct. Int'l Trade R. 26(b)(5)(A). Where no privilege log is supplied, courts have denied claims of

privilege.  *Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1011 (9th Cir. 2007).

However, CBP's untimely privilege claim was inadequate as it failed to include the required "privilege log," any key that would allow Appellant to evaluate the claims or participate meaningfully in the *in camera* review, or statements that would enable Appellant to assess the specific basis for each redaction.  All that the privilege claim attached was a listing of documents, or groups of documents, containing none of the information required by Rule 26(b)(5)(A).  Failure to file an initial privilege log, but instead to maintain general objections to production of materials, can be viewed as sanctionable conduct that helps to multiply proceedings, in violation of 28 U.S.C. § 1927 (1980) and court rules.  *See, e.g.*, *Grider v. Keystone Health Plan Cent., Inc.*, 580 F.3d 119, 142 (3d Cir. 2009).

The CIT's decision to grant each of the Government's privilege claims, without requiring they be specified in a log or otherwise creates an unusual, and "intolerable," *Home Box Office*, 567 F.2d at 54, situation whereby CBP, and the lower court, have access to the full record for review, but Appellant, the party aggrieved by the results of the review, does not.  This hardly promotes the "transparency," *Int'l Cust. Prods.*, 32 C.I.T. at 307, that Congress intended 19 U.S.C. § 1625(c) to deliver.  Moreover, in cases where there are claims of administrative misconduct, the privilege may be waived by such misconduct.  In this case the rec-

ord reflects both deliberate falsification of a government laboratory report, and the conduct of an improper *ex parte* comment process.

The deliberative process privilege is a qualified privilege and can be overcome by a sufficient showing of need. *In re Sealed Case*, 121 F.3d 729, 737–38 (D.C. Cir. 1997). A mere assertion of privilege by the Government neither ends the matter nor ties the court's hands, and "where there is reason to believe the documents sought may shed light on government misconduct, 'the privilege is routinely denied,' on the grounds that shielding internal government deliberations in this context does not serve 'the public's interest in honest, efficient government.'" *Id.* at 738 (quoting *Texaco P.R., Inc. v. Dep't of Consumer Aff.*, 60 F.3d 867, 885 (1st Cir. 1995) Wholesale upholding of privilege is also improper in a case such as this, where there is in place a JPO that would have limited access to the information to Appellant's counsel.

This Court may decide the instant appeal *de novo*, or remand to the CIT for further proceedings. Appellant believes that there are ample grounds to overturn the CIT's judgment as a matter of law. If, however, this Court should remand this case to the CIT for further proceedings, Appellant submits that this Court should order the lower court to deny the Government's claims of privilege, for violation of CIT Rule 26(b)(5)(A), and grant Appellant access to the full record.

## <u>CONCLUSION</u>

For the reasons set forth herein, Appellant submits the judgment below should be reversed.

Respectfully submitted,

  /s/ John M. Peterson
John M. Peterson
  *Counsel of Record*
Maria E. Celis
Richard F. O'Neill
Russell A. Semmel
NEVILLE PETERSON LLP
17 State Street, 19th Floor
New York, NY 10004
(212) 635-2730
jpeterson@npwny.com

May 5, 2014

Slip Op. 14 -22

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| BEST KEY TEXTILES CO. LTD., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Before: R. Kenton Musgrave, Senior Judge |
| | : | Court No. 13-00367 |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## OPINION

[Granting motion for reconsideration and dismissing complaint.]

Decided: February 25, 2014

*John M. Peterson*, *Maria E. Celis*, *Richard F. O'Neill*, *George W. Thompson*, and *Russell A. Semmel*, Neville Peterson LLP of New York, NY, for the plaintiff.

*Marcella Powell* and *Beverly A. Farrell*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, for the defendant. With them on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Amy M. Rubin*, Acting Assistant Director, International Trade Field Office. Of counsel on the briefs were *Claudia Burke* and *Tara K. Hogan*, U.S. Department of Justice, and *Paula S. Smith*, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Musgrave, Senior Judge:  Considering the plaintiff's motion for reconsideration of

that part of the prior opinion on this matter (familiarity with which is here presumed) that addresses

jurisdiction under 28 U.S.C. §1581(i)(4), *see* Slip Op. 13-148 (Dec. 13, 2013), as well as the

plaintiff's alternative motion for transfer to the U.S. District Court for the District of Columbia

pursuant to 28 U.S.C. §1631, the court concludes that quality of the briefing obviates the plaintiff's

motion for oral argument thereon.   Opposition from the defendant U.S. Customs and Border

Protection ("Customs" or "CBP") contends that the prior decision is correct on the plaintiff's lack

of prudential standing to raise the claims it attempts to advance here.   The court agrees it is "highly

questionable" whether a Customs' ruling that lowers the rate of duty on a product the plaintiff has

no expressed intention of importing can result in aggrievement or adverse effect to the plaintiff,[1]

either directly or under a "zone of interests" analysis, as intended under the Administrative Procedure

Act ("APA").   *See* 5 U.S.C. §702; *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 395 (1987) ("it

was [never] thought . . . that Congress, in enacting § 702, had . . . intended to allow suit by every

person suffering injury in fact").   While the court stands by its prior ruling in general, it is,

nonetheless, the plaintiff's product that is the subject of the ruling at issue, and the court has

undoubted exclusive jurisdiction over the general administration and enforcement of this type of

matter in 28 U.S.C. §1581(i)(4).   The court will therefore presume Customs' ruling "reviewable,"

*see Clarke*, 479 U.S. at 399, and the complaint's allegation of "aggrievement" sufficient to invoke

jurisdiction under section 1581(i)(4).   *See* 5 U.S.C. §702; 28 U.S.C. §2640(e); *see also id*.   The prior

judgment and that portion of the opinion addressing jurisdiction under section 1581(i)(4) are

therefore vacated and hereby replaced, and the motions for transfer and oral argument are denied as

moot.   This opinion addresses the merits of the plaintiff's complaint.

I.  *Background; Standard of Review*

By way of brief background, Customs conducted a revocation ruling proceeding in

accordance with 19 U.S.C. § 1625(c).   The proceeding resulted in issuance of Headquarters Ruling

---

[1]  The court remains unaware of any other suit brought against the government on the claim that the plaintiff or its property should be assessed a higher rate of tax or duty.

Letter HQ H202560, dated September 17, 2013 ("Revocation Ruling" or "RR"), which revoked New York Ruling Letter ("NY") N187601 (Oct. 25, 2011) ("Yarn Ruling").  The Yarn Ruling had classified the plaintiff's proprietary "BKMY" yarn under heading 5605, Harmonized Tariff Schedule of the United States ("HTSUS"), as "metalized" yarn dutiable at 13.2% *ad valorum*.  The Revocation Ruling's replacement of the Yarn Ruling holds that BKMY is not a metalized yarn of heading 5605 but a polyester yarn dutiable at 8% *ad valorum*.

The issue before Customs, during the formal notice-and-comment revocation proceeding and the less formal Yarn Ruling request, was the proper statutory classification of the imported yarn for customs duty purposes.  This inquiry required (1) ascertaining the proper meaning of specific terms in relevant tariff provisions, which is a question of law; and (2) determining whether the article comes within the description of such terms as properly construed, which is a question of fact.  *See*, *e.g.*, *Park B. Smith, Ltd. v. United States*, 347 F.3d 922 (Fed. Cir. 2003).  These questions implicate the proper standard of judicial review on the matter as it now stands.

On an ordinary *sui generis* classification question, by trial before the court, Customs is entitled to a presumption of correctness on its findings of fact, and review of its interpretation of relevant statutes is *de novo*.  28 U.S.C. § 2639(a)(1); *see*, *e.g.*, *Jarvis Clark Co. v. United States*, 733 F.2d 873 (1984).  The plaintiff argues that even though this case involves a pre-importation ruling, it is the court's obligation to find the "correct decision" to its product's classification pursuant to *Jarvis Clark*,[2] which it avers "does not involve or change the standard of review, but is merely a

---

[2]  *Jarvis Clark* involved an appeal on a protest of a classification, pursuant to which the importer had traditionally borne a so-called dual burden that "apparently arose out of the formalities of pleading: an importer could prevail in a protest only if it pleaded the proper alternative

(continued...)

matter of procedure and remedy." Pl's Reply at 11. The court always endeavors to reach the "correct decision" -- even apart from *Jarvis Clark* -- but be that as it may, this is not an "ordinary" classification case. It is, of course, a review of an administrative record involving the administrative interpretation of the tariff statutes and the facts as they have been mustered before the agency. Such a proceeding is clearly governed by the scope and standard of judicial review of the Administrative Procedure Act ("APA") applicable to the court's residual jurisdiction rather than the evidentiary burdens of proof allocated in 28 U.S.C. §2639. *See* 5 U.S.C. § 706; 28 U.S.C. § 2640(e); *Shakeproof Indus. Prods. Div. of Ill. Tool Works v. United States*, 104 F.3d 1309, 1313 (Fed. Cir. 1997).

Section 706 of the APA provides in relevant part that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, . . ." and "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706.[3] An agency rule would "normally" be arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

---

[2] (...continued)
classification, and the importer carried the burden of proving the facts pleaded." 733 F.2d at 876. The resolution involved the interpretation of 28 U.S.C. §2643(b), which provides that if the court "is unable to determine the correct decision on the basis of the evidence presented in any civil action, the court may order a retrial or rehearing for all purposes, or may order such further administrative or adjudicative procedures as the court considers necessary to enable it to reach the correct decision."

[3] Thus, to the extent *Jarvis Clark* has any applicability here, "the basis of the evidence presented in [this] civil action", 28 U.S.C. §2643(b), can only be construed as being on the basis of the administrative record, and the "correct decision" is whether Customs' ruling thereon is arbitrary, capricious, an abuse of discretion, or not in accordance with law.

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n. v. State Farm

Mut.*, 463 U.S. 29, 43 (1983). In such a review, factual assertions in pleadings and briefs that are

not a part of the administrative record must be ignored by the court. *See*, *e.g.*, *Jinan Yipin Corp.,

Ltd. v. United States*, 35 CIT ___, 800 F. Supp. 2d 1226, 1264 n.48 (2011).

The "arbitrary and capricious" standard of review is "highly deferential," as the

parties agree. Def's Resp. at 17, Pl's Reply at 9. *See*, *e.g.*, *Boltex Mfg. Co. v. United States*, 24 CIT

972, 978, 140 F. Supp. 2d 1339, 1346 (2000) ("[i]t is well-settled that the arbitrary and capricious

standard of review is not merely deferential to agency action, but the *most* deferential of the APA

standards of review") (italics in original), referencing *In re Gartside*, 203 F.3d 1305, 1312 (Fed. Cir.

2000). Pursuant to this standard, the court must (1) consider whether the agency's decision was

based on a consideration of relevant factors and whether there has been a clear error of judgment,

and (2) analyze whether a rational connection exists between the agency's fact findings and its

ultimate action. *See Consolidated Fibers, Inc., v. United States*, 32 CIT 24, 33-36, 535 F. Supp. 2d

1345, 1353-54 (2008) (comparing *Consolidated Bearings Co. v. United States*, 412 F.3d 1266, 1269

(Fed. Cir. 2005) with *In re Gartside*, 203 F.3d at 1312-13); *see also* 3 Charles H. Koch, Jr.,

*Administrative Law and Practice* §§ 10.1[1], 10.3, 10.4, 10.6 (2d ed. 1997 & Supp. 2006).

As above indicated, Customs' revocation rulings are conducted through formal notice

and comment procedure. They therefore would appear to be not simply "interpretations contained

in policy statements, agency manuals, and enforcement guidelines"[4] beyond the "pale" of the

---

[4] *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001), quoting *Christensen v. Harris
County*, 529 U.S. 576, 587 (2000).

Court No. 13-00367 Page 6

*Chevron* deference generally accorded to agency interpretations of statutes the agency is charged with administering. *Cf. Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984) *with Cathedral Candle Co. v. U.S. Intern. Trade Comm'n*, 400 F.3d 1352, 1361 (Fed. Cir. 2005) ("[n]ormally, courts accord *Chevron* deference when Congress has authorized the administrative agency 'to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed'"), quoting *Mead*, 533 U.S. at 229; *see also* 5 U.S.C. §§ 551(4)&(5) (defining "rulemaking" as the "agency process for formulating, amending, or repealing a rule," and a rule is defined as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy").

However, the court remains mindful of *Heartland By-Products, Inc. v. United States*, 264 F.3d 1126 (Fed. Cir. 2001), which essentially declared that revocation rulings are in the same class of Customs' "rulings" that are to be afforded the so-called "deference" of *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). 264 F.3d at 1135. *See Mead*, 533 U.S. at 228, 235; *see, e.g.*, *Warner-Lambert Co. v. United States*, 425 F.3d 1381, 1384 (2005); *Rocknel Fastener, Inc. v. United States*, 267 F.3d 1354, 1357 (2001). *Skidmore* requires "respect" for the thoroughness evident in the administrative ruling, for the validity of the reasoning that led to the ruling, for the evident consistency of the ruling with earlier and later pronouncements, for the formality with which the particular ruling was established, and for other factors that supply a "power to persuade, if lacking the power to control." *Skidmore*, 323 U.S. at 140; *see Mead*, 533 U.S. at 235; *see, e.g.*, *Warner-Lambert Co. v. United States*, 407 F.3d 1207, 1209 (Fed. Cir. 2005). In other words, *Skidmore* provides a neat restatement of the obvious, *i.e.*, the proper consideration that is, or should be, attempted as a matter of course on judicial review of *any* administrative proceeding.

II. *Summary of Revocation Ruling*

As described in the previous opinion, the Yarn Ruling and the Revocation Ruling address the classification of the plaintiff's BKMY yarn product. BKMY is produced from polyester chips melted into a slurry to which aluminum or zinc powder and titanium dioxide (a delusterant) is added. The slurry is then "fired' through a spinneret to create the yarn.

The Yarn Ruling that was revoked allowed BKMY classifiable as a "metalized yarn" of subheading 5605.00.90, HTSUS (2011):

> Metalized yarn, whether or not gimped, being textile yarn, or strip or the like of heading 5404 or 5405, combined with metal in the form of thread, strip or powder or covered with metal:
> Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13.2%

The referenced headings, 5404 and 5405, HTSUS, cover "synthetic" and "artificial" (respectively) "monofilament of 67 decitex or more and of which no cross-sectional dimension exceeds 1 mm; strip and the like (for example, artificial straw) of synthetic textile materials of an apparent width not exceeding 5 mm". Decitex refers to the articles' linear mass density, or fineness.

The Revocation Ruling concluded that the Yarn Ruling was issued erroneously and that BKMY is classifiable under a lower duty rate in subheading 5402.47.90, HTSUS (2011):

> Synthetic filament yarn (other than sewing thread), not put up for retail sale, including synthetic monofilament of less than 67 decitex:
> Other, of polysters:
> Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8%

Customs began its analysis in the revocation proceeding by setting forth the standard legal construct for customs classification, to wit: Merchandise is classifiable under the HTSUS in accordance with the General Rules of Interpretation ("GRIs"). GRI 1 provides that classification shall be determined according to the terms of the headings and any relative section or chapter notes

and, provided such headings or notes do not otherwise require, according to the remaining GRIs 2

through 6. GRI 6, HTSUS, requires that the GRI's be applied at the subheading level on the

understanding that only subheadings at the same level are comparable. The GRIs apply in the same

manner when comparing subheadings within a heading. RR at 2.

        After summarizing the relevant HTSUS provisions at issue, Customs quoted the

relevant Harmonized Commodity Description and Coding System Explanatory Notes ("EN") to

heading 5605, HTSUS. Customs noted that the ENs are neither legally binding nor dispositive, but

constitute "official interpretation of the Harmonized System at the international level" as

"commentary on the scope of each heading of the HTSUS and . . . are generally indicative of the

proper interpretation of these headings." *Id.* at 3 (citation omitted). The EN to heading 5605,

HTSUS, is as follows:

This heading covers:

(1) **Yarn consisting of any textile material (including monofilament, strip and the like and paper yarn) combined with metal thread or strip,** whether obtained by a process of twisting, cabling or by gimping, whatever the proportion of the metal present. The gimped yarns are obtained by wrapping metal thread or strip spirally round the textile core which does not twist with the metal. Precious metals or plated metals are frequently used.

(2) **Yarn of any textile material (including monofilament, strip and the like, and paper yarn) covered with metal by any other process**. This category includes yarn covered with metal by electro-deposition, or by giving it a coating of adhesive (e.g., gelatin) and then sprinkling it with metal powder (e.g., aluminium or bronze).

The heading also covers products consisting of a core of metal foil (generally of aluminium), or of a core of plastic film coated with metal dust, sandwiched by means of an adhesive between two layers of plastic film.

The heading covers multiple (folded) or cabled yarn containing plies of the yarn referred to above (e.g., fancy cords as used by confectioners, obtained by twisting together two or more metallised yarns as described above). It further includes certain

other forms of yarn made in the same way and used for similar purposes, consisting of two or more parallel metallised yarns held together with a binding of metal thread or strip, and yarn or bundles of yarn gimped with yarn of this heading.

Metallised yarn may be gimped. It is used in the manufacture of trimmings and lace and of certain fabrics, as fancy cords, etc.

The heading **does not include**:
(a) Yarn composed of a mixture of textile materials and metal fibres conferring on them an antistatic effect (**Chapters 50 to 55**, as the case may be).
(b) Yarn reinforced with metal thread (**heading 56.07**).
(c) Cords, galloons or other articles having the character of ornamental trimmings (**heading 58.08**).
(d) Wire or strip of gold, silver, copper, aluminium or other metals (**Sections XIV and XV**).

*Id*. at 3-4 (as quoted in RR).

Based on the foregoing, when considering the plaintiff's argument that BKMY satisfies the terms of heading 5605 notwithstanding the "extremely minute amount of metal" and lack of description of the plaintiff's process of manufacture in the ENs, Customs agreed "that it is the nature of the product rather than the process of manufacture which is the key consideration in determining whether the product is classifiable in heading 5605." *Id*. at 4. After restating the definition of "metalized yarn" in heading 5605 ("being textile yarn, or strip or the like of heading 5404 or 5405, combined with metal in the form of thread, strip or powder or covered with metal"), Customs concluded that BKMY did not meet that definition as it was not "combined" with metal. Customs also considered "[w]hether a polyester slurry falls within the meaning of 'or the like'" and concluded that "is unclear from the legal text alone." Customs then looked to the ENs for heading 5605 for "guidance". Customs found that those ENs

clearly contemplate that not every product combining yarn and metal in some fashion will be considered a metalized yarn for tariff purposes. The ENs specifically describe two types of products covered by heading 5605, HTSUS: 1) Yarn consisting of any

> textile material (including monofilament, strip and the like and paper yarn) combined with metal thread or strip, and 2) Yarn of any textile material (including monofilament, strip and the like, and paper yarn) covered with metal by any other process. The ENs further emphasize that metalized yarn of heading 5605 is used for decorative purposes, for example "in the manufacture of trimmings and lace and of certain fabrics, as fancy cords, *etc*.". The ENs specifically exclude yarns composed of a mixture of textile materials and metal fibres [*sic*], and yarns reinforced with metal thread from classification in heading 5605, HTSUS. Thus, while heading 5605 may allow for new methods of production of metalized yarn, the mere presence of metal in the yarn does not automatically result in classification in heading 5605, HTSUS.

*Id*.

Customs concluded the description of "metalized yarn" in the ENs to heading 5605 was "also consistent with the common and commercial meaning of the term." *Id*. at 5. Examining dictionaries and other lexicographic materials to determine the common meaning of the term as well as consulting with industry sources, Customs confirmed that the extent of the commercial meaning of "metalized yarn" does not encompass every possible form of yarn with metal added but has a specific meaning consistent with the ENs to heading 5605 "which does not encompass the Best Key yarns at issue." *Id*. Commerce found that the common and commercial meanings of the term "indicate that 'metalized yarn' is commonly understood to mean either a pre-existing yarn consisting of any textile material combined with metal, or a plastic film deposited with metal and slit into yarn, generally used for decorative purposes." *Id*. Customs noted that the Federal Trade Commission definition of "metallic" is consistent with its conclusion, *see* 16 C.F.R. §303.7(o) ("A manufactured fiber composed of metal, plastic-coated metal, metal coated plastic, or a core completely covered by metal") and it found no "similar products" described as metalized yarns among the "numerous technical sources on metallic yarns and fibers" it consulted. *Id*. at 5-6. Rather, these "technical

sources on metalized yarn noted that metallic yarns consist of pre-existing yarn or plastic film bonded to metal", and they also "stress that they are used primarily for decorative purposes." *Id.*

"Similarly," Customs reasoned,

> textile industry experts consulted by CBP from the American Fiber Manufacturers Association [AFMA] and the National Council of Textile Organizations [NCTO] were in agreement that the textile industry considers a metalized yarn to be either a textile yarn covered or coated with metal, or a plastic film deposited with metal and slit into yarn. This is consistent with what CBP has classified in heading 5605 in the past, and consistent with the Explanatory Notes to heading 5605, HTSUS. Thus, we conclude that the term "metalized yarn" as commonly and commercially understood, is a manufactured fiber composed of metal, plastic-coated metal, metal-coated plastic, or a core completely covered by metal, including metal sandwiched between layers of plastic, as in Lurex yarns, having a visible metallic effect or appearance.

*Id.* at 6.

Customs then responded to the plaintiff's comments submitted in opposition to the proposed revocation. Addressing the affidavit opinion of Ingrid Johnson, the plaintiff's authority on textiles who had opined that BKMY is a "metalized yarn" according to a then-forthcoming definition of metallic yarn in the latest edition of a *Fairchild* dictionary,[5] Customs noted that the *Fairchild* definition "is completely consistent with" the definitions of the technical sources Customs had summarized and "does not reference any method of production similar to that used by Best Key". *Id.* at 7. Customs further noted that "[a]lthough this definition allows for the possibility of other combinations of textile and metal, not specifically mentioned, being a metallic yarn, it does not state that any textile yarn containing metal must automatically be considered a metallic yarn" as argued by the plaintiff. Customs thus reasoned that regardless of whether the *Fairchild* definition

---

[5] *See* Phyllis G. Tortora and Ingrid Johnson, *The Fairchild Books Dictionary of Textiles*, p. 383 (Bloomsbury, 8th ed., 2013). The Revocation Ruling refers to this as "Fairchild's Dictionary of Fashion."

Court No. 13-00367                                                          Page 12

is intended to include such products or not, the definition does not support the argument that BKMY

should be considered metalized yarns for customs duty purposes, as

> [s]uch an interpretation would be far more expansive than the plain text of the heading, the ENs[,] or the technical definitions would support. Indeed, it is difficult to imagine what woudn't fall within the scope of metalized yarn based on such a reading.

*Id*. (noting antistatic yarns, and yarns reinforced with metal thread, as examples of articles coming

within the *Fairchild* definition but which are specifically excluded from heading 5605 pursuant to

its ENs). Customs did not find the "Angelina" fibers analogous because they "have a distinctive and

notable metallic, luminescent sheen." *Id*.

Customs then considered the more expansive claim, beyond visibility, to wit, that "in

a metalized yarn, the metal is added for a specific purpose, to add desirable characteristics to a fabric

such as . . . antimicrobial properties, or UV protection" as claimed by the plaintiff. *Id*. at 7-8.

Customs rejected the argument in this instance for four reasons. First, Customs found that the

plaintiff had provided no evidence to prove that the BKMY, for which the original Yarn Ruling letter

had been sought, in fact held the "desired characteristics" claimed of its metals, namely "that the

aluminum or zinc added to the instant yarns impart any microbial properties of UV protection to the

fiber, or even that they could have such an effect in such low concentrations." *Id*. at 8. Second,

Customs found that adding metal before extrusion "is not itself a new procedure" and that

"[h]eretofore, such products have not been considered metalized yarns." *Id*. (references omitted).

Third, Customs found that the various Customs rulings the plaintiff claimed as classifying yarns

having no metallic appearance in heading 5605 in fact are all described as "decorative" or "metallic"

or are used in decorative applications such as decorating packages. *Id*. Fourth, Customs noted that

while it "does not impose a strict requirement with respect to the amount of metal that must be present in order for a yarn to be considered metalized, tests conducted by the [Customs] Laboratory indicate that the samples of Best Key's yarns submitted for analysis contain only trace amounts of metal." *Id*. at 9.  In sum,

> [g]iven that many products and preparations used in textiles, such as those of heading 3809[ ], contain metallic substances, and even natural fibers may naturally contain trace amounts of metal absorbed from the soil, many yarns may consequently have traces of metal simply as a result of common treatments such as dye fixing or delustring.  To classify any fiber with as little metal as is present in the instant yarn in heading 5605 would expand the heading far beyond its current scope, to include any yarns which contain trace amounts of metal as a byproduct of common textile treatments and which have never been considered metalized yarn.  As noted above, by contrast, the products recognized as metalized yarns in the textile industry have much higher concentrations of metal, with the result that the metal is immediately apparent.

*Id*. (footnote omitted).

### III.  *Discussion*

As indicated above, heading 5605 addresses the imported state of textile yarn, or strip or the like of heading 5404 or 5405, combined with metal.  The obvious question Customs had to address was whether the product contemplated for importation is a textile-yarn-metal combination in the sense contemplated by heading 5605.

Both parties acknowledge the axiom that it is a product's "nature" upon importation that controls its classification.  They also agree it is not the process of manufacture that is "key" in determining whether a yarn is properly entered as "metalized yarn."  Where they differ is not only over Customs' legal interpretation of the language of heading 5605 but also Customs' factual findings and conclusions in the Revocation Ruling.  On review of an administrative record, of

course, the court is precluded from substituting judgment on facts with "two fairly conflicting views" in the absence of showing that a finding is arbitrary, capricious or an abuse of discretion, *Universal Camera Corp. v. NRLB*, 340 U.S. 474, 488 (1951), but the plaintiff argues that the language of heading 5605 is "clear," and that since the heading is *eo nomine*, it covers "all forms" of the article including BKMY. *See Carl Zeiss, Inc. v. United States*, 195 F.3d 1375, 1379 (Fed. Cir. 1999).

The government is correct, however, that an *eo nomine* provision does not cover all forms when such coverage is contrary to legislative intent or when the articles are limited by the terms of the statute. In such a case, the provision only includes those articles embraced by the provision's language. Def's Resp. at 20, referencing *United States v. Charles R. Allen, Inc.*, 37 CCPA 110, C.A.D. 428 (1950); *RMS Electronics, Inc. v. United States*, 83 Cust. Ct. 37, 43, 480 F. Supp. 302, 306 (1979). Further, although the "clarity" of heading 5605 literally covers all forms of yarn-and-metal combinations, Customs implicitly found that the language cannot be interpreted literally, because it was not, in fact, intended to cover all forms, as evident in heading 5605's ENs' specific exclusion of four classes of articles from coverage (*e.g.*, antistatic yarns). *See* RR at 4. Customs' research and consultation with industry sources also confirmed that the commercial meaning of "metalized yarn" does not encompass every possible form of yarn with metal added. *Id*. at 5. Customs' conclusion that heading 5605 does not in fact cover "all forms" of yarn-and-metal combinations is persuasive, and the plaintiff's arguments to the contrary are not.

The plaintiff also disagrees with the Revocation Ruling's holding (assuming that is what it amounts to) that heading 5605 requires the combination of two distinct intermediary products, namely (i) a pre-existing yarn or strip "or the like" of heading 5404 or 5405, and (ii) metal

Court No. 13-00367                                                    Page 15

in the form specified in heading 5605. However, the plaintiff does not persuade that Customs'

interpretation is unlawful or should be regarded as unpersuasive. As employed in heading 5605,

"being textile yarn" *etc.* "combined with metal" obviously alludes to the state (*i.e.*, as imported) of

"being" a metalized yarn intended to be encompassed by heading 5605 (*i.e.*, of unity or coalescence),

but it may also encompass the process by which such a yarn is brought into "being" (*i.e.*, the result

of which two or more substances are joined to make a single substance). Since either interpretation

is possible, the statute is ambiguous to that extent. *See*, *e.g.*, *Rifkin Textiles Corp. v. United States*,

62 Cust. Ct. 316, 297 F. Supp. 1127, 1134 (1969) (the court "find[s] the term 'ornamented fabrics'

to be ambiguous, taking that word in the sense that the court is not entirely certain of the meaning

of the statutory language when applied to the particular facts of this case" and therefore "resort to

pertinent authoritative materials to ascertain the meaning of the term is permissible"). The plaintiff

opted for this route of administrative and judicial process, and it is not the court's function in this

proceeding to resolve that ambiguity but only determine whether Customs' ruling has "power to

persuade" in accordance with *Mead* and *Skidmore*. Customs emphasized on the record that it is the

nature of the product upon importation that is determinative, *see* RR at 4, and contrary to the

plaintiff's contention, the court is not persuaded that the process of "being . . . combined" is

"irrelevant" to that determination and an erroneous interpretation of the statute.

The plaintiff further argues Customs "seeks to engraft" the exemplars of the ENs to

heading 5605 "as limitations on the construction of heading 5605 itself", which type of "reasoning

was explicitly rejected by the Federal Circuit in *Midwest of Cannon Falls, Inc. v. United States*, 122

F.3d 1423 (Fed. Cir. 1997)". Pl's Br. at 22. This appears to misinterpret Customs' analysis, *supra*,

and the *Cannon Falls* decision. Customs did not "engraft" from the ENs to heading 5605 but looked to them for guidance. The process of that interpretive guidance is in contrast with the *Cannon Falls* case, which involved Customs' reading into the HTSUS provision for "Christmas ornaments" the limitation "tree." The term was clearly not present in the relevant tariff provision. The "tipping point" for the Federal Circuit on the issue, however, was not Customs' interpretation of the ENs therefor, but the apparent fact that "tree" had been explicitly excluded by Congress upon supersedure of the prior tariff provision of the Tariff Schedules of the United States, in which the term "tree" had appeared. *See* 122 F.3d at 1429 ("The examples in the Explanatory Notes, however, cannot control here, *particularly in light of* the congressional omission of the word 'tree.'") (italics added).

Continuing, the plaintiff makes the parallel argument that a tariff provision will encompass a future-developed version of a product if the product bears an "essential resemblance" to the goods (or, where applicable, exemplars) identified in the tariff heading. Pl's Br. at 27-28, referencing *Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 789 (Fed. Cir. 1988). The government's position is that "because the language of heading 5605, HTSUS, makes clear that Congress intended that the statute be limited to only those products embraced by its language", the "essential resemblance" doctrine is inapplicable to the instant goods. Def.'s Resp. 26-27. The plaintiff contends the government is implying, in effect, that heading 5605 is an evolutionary "dead end" that cannot be stretched to embrace newly-developed products.

Here, the plaintiff overstates the government's position. Nowhere does Customs contend that a "newly developed product" would not be a product of heading 5605 "embraced by its language". The plaintiff asks why would the combination of metal powder with plastic in liquid

polymer form (*i.e.*, the plaintiff's process) "be something prohibited or unanticipated under the statute?",  Pl's Reply at 17, but it is the "nature" of the product, not the newness of its "development" (or technical production process), that drives its classification.  Customs simply found the plaintiff's product classifiable under a different heading (5402.47.90, HTSUS), and the plaintiff's rhetoric does not render Customs' Revocation Ruling unreasonable or unpersuasive.

The plaintiff next accuses Customs of "substantial *ex parte* communications between Customs and domestic industry lobbyist groups and competitors of Best Key for the purpose of soliciting their comments" which "is 'intolerable' and alone renders the proceedings arbitrary." Pl's Reply at 20, referencing *Home Box Office, Inc v. FCC*, 567 F.2d 9, 54 (D.C. Cir. 1977).  *See also id*. at 24.  However, there is no indication from the record that the individuals involved in the communications were with "competitors" of the plaintiff or "lobbyists" on the issue, let alone that this is an instance where domestic industry representatives "described the kind of . . . regulation that, in their view, [they] 'could live with.'"  567 F.2d at 53.  Nor does the plaintiff persuade that there is a "possibility that there is here one administrative record for the public and this court and another for [Customs] and those 'in the know'".  *Id*. at 54.  *Cf.* Slip Op. 13-145, 37 CIT ___ (Dec. 4, 2013).  It is plain from the record that during Customs' internal debate, prior to deciding whether the Yarn Ruling should be revoked or was correct, it simply reached out for help informing its own expertise.  *See, e.g.,* Administrative Record Document ("AR") at 539-42.  That is not unlawful.

Nonetheless, the plaintiff also takes issue with what it claims is the government's "conclusory" characterization of the plaintiff's "expert-opinion" affidavit on the record (which source avers that BKMY "bears an essential resemblance to metalized yarns known to commerce

and science") by attempting to disparage the level of expertise and opinions of the head of AFMA and the vice-president of NCTO. For example, the plaintiff claims the record "certainly" establishes that the opinion of the plaintiff's supporter "is much more reliable than the supposed 'industry experts' consulted by Customs." However, Customs appears to have adequately considered the opinion of the plaintiff's expert in its ruling construing the relevant statute. Customs' construction is not unlawful, and the court must defer to the agency's reasonable factual conclusion on whether the BKMY does or does not meet the statutory definition of "metalized yarn" as lawfully construed.

The plaintiff further contests the Revocation Ruling's statement that AFMA and NCTO "were in agreement that the textile industry considers a metalized yarn to be either a textile yarn covered or coated with metal, or a plastic film deposited with metal and slit into yarn" as a misrepresentation of the substance of Customs' communications with NCTO, and assignment to that group and others positions not reflected in the administrative record. If the plaintiff is correct on this latter point, it has not been prejudiced by Customs' arguably erroneous characterization. *See* 5 U.S.C. §706 (requiring "due account . . . of the rule of prejudicial error"). Whether it is an arguable "stretch" to characterize NCTO's communications with Customs, on behalf of itself and also in expressing the "view" of the head of AFMA, as those organizations' "agreement" with Customs' interpretation of heading 5605, those communications do, however, express the organizations' representatives' understanding of the question, and there is no indication on the record that those representatives or organizations held or would have held views significantly different than as stated by Customs. The court's role in this record does not involve re-weighing the evidence, choosing

between fairly competing alternatives, and substituting its own factual findings or judgment therefor. *Universal Camera Corp.*, *supra*.

The plaintiff also argues that the Revocation Ruling evinces a "lack of thoroughness" because Customs never "followed up" on information received from industry officials indicating that BKMY was in fact not a product unknown to the "metalized yarn industry." Pl's Reply at 22. Even if Customs was required to follow up on that line of thought, it is unclear what additional information, if any, would have necessitated a different or contrary analysis or interpretation of heading 5605. In any case, it is evident that Customs considered the addition of "chemicals [like metal] before extrusion", *see*, *e.g.*, AR at 541, in making its Revocation Ruling, as outlined above.[6]

On a different tack, the plaintiff contends the Revocation Ruling arbitrarily applies an "unstated and ambiguous" *de minimis* standard of metal content "for the purpose of" revoking the Yarn Ruling. Pl's Br. at 40-43, referencing *Del Monte Corp. v. United States*, 730 F.3d 1352 (Fed. Cir. 2013); Pl.'s Reply at 25-29. *Del Monte* involved "a *century* of tariff enforcement to the effect that 'in oil' signifies any amount of such substance" for purposes of classifying *fish* packed "in oil." 36 CIT ___, 885 F. Supp. 2d 1315, 1320 (2012) (italics added). That is not this case. Further, the plaintiff's argument relies on the false premise that Customs set a *de minimis* standard for heading 5605, which the record does not support, and which the plaintiff itself recognizes. *See* Pl's Br. at

---

[6] The court merely notes in passing that the plaintiff ascribes nefarious and "disturbing" motives to Customs' internal discussion of "policy concerns" to argue that the Revocation Ruling is results-oriented. The argument fails. Nothing on the record indicates that Customs' discussions were results-oriented, and Customs' "policy" is precisely what 19 U.S.C. §1625 rulings are all about, at least in part. Customs' free and unfettered discussion thereof, internal or otherwise, albeit with notice and comment as circumstances may require, at any time is to be encouraged. *See*, *e.g.*, *International Custom Products, Inc. v. United States*, 32 CIT 302, 307, 549 F. Supp. 2d 1384, 1391 (2008).

40 (the Revocation Ruling "does not impose a strict requirement with respect to the amount of metal

that must be present in order for a yarn to be considered metalized"), citing AR at 9.  The absolute

amount of a substance's presence does not determine the applicability of the *de minimis* rule, the

intent of its introduction to serve a definite and useful purpose does, in which case the rule is

inapplicable.  *See*, *e.g.*, *Canada Dry Ginger Ale, Inc. v. United States*, 43 Cust. Ct. 1, 8-9  (1959).

In any event, Customs did not conclude during the revocation proceeding that the subject yarn was

not a metalized yarn "due" to an insufficient amount of metal, Customs determined that the yarn did

not qualify as a metalized yarn because it did not fall as a matter of fact within the scope of the

statutory language of heading 5605 and within the meaning of the term "metalized yarn."

       Continuing on this point, the plaintiff argues that the tariff definition of "metalized

yarns" covers articles with any proportion of metal present, and it points to the ENs to heading 5605

for "support" because the ENs contain no language which requires a minimum threshold amount of

metal in the yarn.  All the same, it cannot be concluded that the Revocation Ruling was arbitrary or

capricious in concluding that the mere presence of metal in yarn does not automatically result in

classification in heading 5605.

       In its motion for judgment, Pl's Br. at 41, the plaintiff cites to the Informed

Compliance Publications (ICPs) "Classification: Apparel Terminology under the HTSUS" (June

2008) ("*ICP I*") and "Classification of Fibers and Yarns" (Sep. 2011) ("*ICP II*"), to support its

contention that any presence of metals in textile yarn would qualify the product as a metalized yarn

of heading 5605.  These ICPs do not appear to be part of the administrative record before the court

but are included (albeit improperly, the government contends) in full in the plaintiff's Appendix of

Documents. The plaintiff cited to the February 2009 version of the latter in its request for reconsideration (*see* AR 394 n.2), and it here argues that *ICP II* states that while the actual amount of metal present is typically quite small, "any of *these* yarns that have metal present, whatever the portion of metal present, is classified as a metalized yarn under heading 5605." *See ICP II* at 17 (italics added). But as the government points out, when examined in context this single phrase recited in the plaintiff's submission to Customs clearly speaks to "those" yarns that are included in subsection (1) of the ENs to heading 5605, *i.e.*, yarns combined with metal thread or strip, and/or refers to Note 2(B)(a) of Section XI, HTSUS.[7] The ICPs do not discuss the issue addressed in the Revocation Ruling, which is whether a product made by adding nanometals to polyester slurry results in a metalized yarn in the first instance.

Nonetheless, the plaintiff argues that prior rulings have "uniformly" and "correctly" stated that a yarn that contains any amount of metal is considered in its entirety as a metalized yarn for tariff purposes, and that Customs only considers whether the yarn contains any metal. Pl's Br.

---

[7] The plaintiff also claims to take issue (Pl's Reply at 17-18), but in reality agrees, with the defendant's interpretation of Note 2 of Section XI, HTSUS :

> (A) Goods classifiable in chapters 50 to 55 or in heading 5809 or 5902 and of a mixture of two or more textile materials are to be classified as if consisting wholly of that one textile material which predominates by weight over each other single textile material. . . .
>
> (B) For the purposes of the above rule:
>
> (a) metalized yarn (heading 5605) [is] to be treated as a single textile material the weight of which is to be taken as the aggregate of the weights of its components; for the classification of woven fabrics, metal thread is to be regarded as a textile material.

In particular, the plaintiff proposes that a yarn composed of 90% polyester and 10% metal would be classified as a polyester yarn if the "10% metal" component is actually a "non-metalized" yarn, and note 2(A) applies, whereas note 2(B) applies if the product as a whole is a metalized yarn. But that still begs the question of whether BKMY is or is not classifiable as a "metalized yarn."

at 41.  The plaintiff complains that Customs has arbitrarily "separated" its yarn from all other "metalized yarn" products in holding that its yarn alone is not metalized yarn.  Contrary to such hyperbole, however, Customs did not act arbitrarily and capriciously in holding that the yarn was not "metalized" or in treating it differently from the products included in rulings cited by the plaintiff.  As discussed in the Revocation Ruling, the rulings the plaintiff referenced are distinguishable from the plaintiff's yarn because they are rulings in which yarns were described as "decorative" or "metallic" or were used in decorative applications.  *See* RR at 8, citing NY N062518, NY L82752, NY R00713, NY J84177, NY J82793 (revoked by HQ 967829), NY I80137, NY J84274, NY B89028, NY B89130, NY B89128, NY N062518 and NY R00713.  None of the "decorative" or "metallic" yarn rulings involve a product created with the plaintiff's metal-in-the-slurry technique, which the plaintiff describes as a "new and unique nanometal process."  The cited rulings are for statutory metalized yarns, primarily yarns plied with metallic strip.  *See*, *e.g.*, NY J82790 ("decorative metallized yarn" comprised of polypropylene yarn mixed with metallic strip); NY L86561 (polyester yarn "in the form of metallic strips"); NY F83891 (aluminum-coated polyester strip); NY N034758 (metalized yarn comprised of acrylic and polyester coated with metal).  These products clearly have metallic or metalized fibers or strip in them and were not produced through the addition of nanometals to a slurry.  BKMY was not classified in the same manner as these products because it is not of the same nature.

        Furthermore, it is incorrect to state that Customs has never considered any yarn containing metal to be anything other than "metalized" for tariff purposes.  In HQ 952934 (July 19, 1993), Customs' Headquarters ruled on the classification of a fabric comprised of 45% cotton, 47%

polyester and 8% stainless steel.  *See* AR at 511-516.  The yarns from which the fabric was

constructed were characterized by a core of polyester fibers mixed with micro fiber stainless steel

surrounded by cotton fiber.  The fabric was used to manufacture garments that provide protection

from microwave radiation.  Customs sought to determine whether the metal fiber incorporated in the

fabric could be characterized as "metalized yarns" or "metal thread."  Citing the ENs to heading

5605, HTSUS, Customs concluded that "[i]t is our position that the stainless steel fibers that are

combined with the textile fibers to compose this fabric are not considered 'metalized yarns'

classifiable in heading 5605."  Customs found that the fabric did not consist of yarns combined with

metal thread or strip, nor was it a yarn covered with metal by any process.  Unlike the rulings cited

by the plaintiff, which concern products that are decorative and/or that involve textile items

comprised in part of metal fiber, this ruling may be more directly on point.  Although the stainless

steel was present in substantial quantities, the yarn was not "metalized" because it did not fit within

the products described in the ENs, which is similar to Customs' holding in the Revocation Ruling.

For the purpose of addressing the plaintiff's arguments in the revocation proceeding,

Customs assumed, but did not concede, that yarns "metalized" for a specific, practical, non-

decorative purpose are within the scope of heading 5605.  Customs then bolstered its ultimate

conclusion that the Yarn Ruling should be revoked by noting that its laboratory analysis had found

only a "trace" of metals in the plaintiff's yarn at a level apparently consistent with naturally occurring

content or leftover intermediate processes (*e.g.* dye fixing or delustring).[8]  Customs observed that

"the actual amount of metal present is quite small in relation to the weight of the textile fibers" and

---

[8]    The plaintiff argues that the metal introduced into the polyester slurry should not be considered "trace", but the plaintiff points to nothing in the record to the contrary.

it thus found that the record lacked evidence to support that the metals in the BKMY provided the

specific, practical, non-decorative purposes claimed even assuming the hypothetical that heading

5605 encompasses non-decorative metal properties.

        The plaintiff argues that analysis is legally irrelevant insofar there is no explicit

"requirement" in heading 5605 that the metal of the metalized yarns thereof perform any specific

function, and thus the plaintiff argues that it did not have to prove anything other than the fact that

it intentionally added a quantum of metal to its polyester slurry in order to qualify the product as a

metalized yarn of heading 5605.  But again, the plaintiff's literal reading of heading 5605 cannot be

the case.  Even "whimsy" is motivated by desire -- all metal is sought (or introduced) for its specific,

desired properties, *cf.*, *e.g.*, *Wacker Chemical Corp. v. United States*, 78 Cust. Ct. 113, 117 (1977);

*E. Taranger, Inc. v. United States*, 51 Cust. Ct. 298, 300 (1963); *C.J. Tower & Sons v. United States*,

32 Cust. Ct. 339, 344 (1954); *C.J. Tower & Sons v. United States*, 26 Cust. Ct. 284, 290 (1951) --

and the plaintiff's claim to Customs, that it added nanometal particles in BKMY intentionally for

specific properties (aluminum or zinc for ultraviolet protection, silver or copper for antimicrobial

applications and the like),[9] belies the argument it would make here.

        Customs' analysis of the hypothetical, of the claim that any amount of metal added

to impart some desirable quality beyond visibility qualifies the product as a "metalized" yarn of

heading 5605, clearly indicates that if the claimed quality is not obviously discernable, it must at

least be measurable, which implies at least a minimum threshold or quantum of proof that the

---

        [9] Notwithstanding its assertions here on what was before Customs, at least for purposes of
the Yarn Ruling it appears the plaintiff claimed that the antimicrobial properties of its BKYM (at the
time) are imparted by titanium dioxide added to the polyester slurry, not silver.

imparted, desired quality is in fact imparted. *Cf. United States v. American Shipping Co.*, 15 U.S. Cust. App. 249, T.D. 42261 (1927) (the term "however small" added nothing to the specificity of paragraph 1430 of the Tariff Act of 1922). In the end, Customs reasoned that to classify in accordance with the logic of the plaintiff's argument any fiber "with as little metal as is present in the instant yarn in heading 5605 would expand the heading far beyond its current scope, to include any yarns which contain trace amounts of metal as a byproduct of common textile treatments, and which have never been considered metalized yarn."

This logic holds especially persuasive power. By the plaintiff's literal reasoning, even a barely measurable amount of metal -- a couple of atoms? -- "intentionally" introduced and dispersed into a slurry would suffice for a "metalized" yarn of heading 5605. That is, quite literally, *reductio ad absurdum*.

The plaintiff points to no statutory language in heading 5605 or otherwise that would indicate Congress intended that heading to apply to any product containing any amount of metal, no matter how minute, and regardless of its effect or purpose, and unlike *Dal Tile*, this statue is not "plain" regarding the amount of metal necessary to make a "metalized" yarn. *Cf. Dal-Tile Corp. v. United States*, 424 F.3d 1286, 1290 (Fed. Cir. 2005), referencing *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 471 (1989) (Kennedy, J., concurring) (absurdity excepts "plain" meaning where it is "quite impossible" Congress intended the result). The court, thus, is not persuaded that "whatever the proportion of the metal present" (*see* ENs to heading 5605; *cf. ICP I & ICP II*), which is not a part of the language of heading 5605 itself, was written with an intent to

encompass the minute "proportion" to which nanoparticulate metal may theoretically be reduced and "intentionally" introduced into a product resulting from the likes of the plaintiff's process.

During the revocation proceeding, the plaintiff did not persuade Customs that heading 5605 actually encompasses any non-decorative properties of metal as well as decorative properties. No opinion here need be expressed on whether that is a correct reading of heading 5605, because in the final analysis the plaintiff failed to prove to Customs that even if heading 5605 does encompass non-decorative metal properties, the BKMY considered for purposes of the Yarn Ruling in fact exhibits the specific properties claimed to be provided by the "combined" metal. Custom's factual finding on this issue in the Revocation Ruling, and more broadly that the BKMY is not a metalized yarn of heading 5605, was therefore not arbitrary or capricious, and the court may not substitute judgment therefor.

The plaintiff has failed to persuade that the Revocation Ruling, as a whole, is arbitrary, capricious, an abuse of discretion, or not in accordance with law, and the court finds that the Revocation Ruling has the power to persuade, and also that the plaintiff's remaining arguments are without merit.

Court No. 13-00367                                                                                          Page 27

### Conclusion

In view of the foregoing, the plaintiff's motion for judgment is denied.  The

defendant's USCIT Rule 12(b)(1) motion to dismiss is converted into a cross-motion for judgment

pursuant to USCIT Rule 56.1.  *See*, *e.g.*, *Carl v. U.S. Secretary of Agriculture*, 36 CIT ___, 839 F.

Supp. 2d 1351 (2012).  Upon consideration in accordance with the foregoing, that motion is granted,

and the defendant's alternative motion for further discovery, and the plaintiff's motion for oral

argument, are hereby dismissed as moot.

**So ordered**.


                                                                /s/  R. Kenton Musgrave                                 
                                                                R.  Kenton Musgrave, Senior Judge

Dated: February 25, 2014
           New York, New York

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| | : |
| BEST KEY TEXTILES CO. LTD., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :   Before: R. Kenton Musgrave, Senior Judge |
| | :   Court No. 13-00367 |
| UNITED STATES, | : |
| | : |
| Defendant, | : |
| | : |
| | : |

## AMENDED JUDGMENT

The court having entered a judgment of dismissal of this action pursuant to slip opinion 13-148 (Dec. 13, 2013), and the plaintiff having filed a motion for reconsideration of that judgment and opinion, and the court, after due deliberation, having considered and rendered a decision on the motion herein; Now therefore, in conformity with said decision, it is

ORDERED that the plaintiff's motion for reconsideration be, and hereby is, granted, and it is further

ORDERED that the prior judgment on this matter, and that portion of the prior opinion that pertains to jurisdiction claimed under 28 U.S.C. §1581(i)(4), both be, and hereby are, vacated, and it is further

ORDERED that the defendant's motion to dismiss, as converted in accordance with said decision into a motion for judgment pursuant to USCIT Rule 56.1, be, and hereby is, granted; and it is further

ORDERED, ADJUDGED and DECREED that judgment be, and hereby is, entered in favor of the defendant, and it is further

ORDERED, ADJUDGED and DECREED that this action be, and hereby is, dismissed anew.

/s/ R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: February 25, 2014
New York, New York

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

May 5, 2014

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

Russell A. Semmel

Name of Counsel

/s/ Russell A. Semmel

Signature of Counsel

Law Firm    NEVILLE PETERSON LLP

Address    17 State Street, 19th Floor

City, State, ZIP   New York, NY 10004

Telephone Number   212-635-2730

FAX Number   212-635-2734

E-mail Address   rsemmel@npwny.com

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.